UNITED STATES of America, Appellee,

v.

Lester GENSER

and

Lawrence Forman, Appellants.

Nos. 76–2623 and 76–2624.

United States Court of Appeals,
Third Circuit.

Argued Oct. 4, 1977.

Decided Aug. 29, 1978.

Irving R. Segal, Herbert S. Mednick, James D. Fornari, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants; Zuckerman & Aronson, Newark, N. J., of counsel.

John J. Barry, Asst. U. S. Atty., Jonathan L. Goldstein, U. S. Atty., Maryanne T. Desmond, Asst. U. S. Atty., Appeals Div., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and BIGGS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The appellants, defendants below, Genser and Forman, appeal from their convictions by a jury for violations of 18 U.S.C. §§ 2, 371, and 26 U.S.C. §§ 7201, 7206(1). The indictment charged both appellants with conspiracy to evade personal and corporate income taxes, and with the substantive crimes of evading corporate and personal income taxes, and subscribing to corporate tax returns which understated their adjusted gross income. The appeals were consolidated pursuant to the rules of this court and are properly before us pursuant to 28 U.S.C. § 1291.

The appellants assert (1) that there is insufficient evidence to support their convictions on the personal income tax charges; (2) that the trial court erred in permitting an agent of the Internal Revenue Service to testify as to the results of an audit of their corporation's books, which audit the agent did not conduct or supervise and which was not introduced into evidence; and (3) that the United States procured some of its evidence illegally by administrative summons-

es pursuant to 26 U.S.C. § 7602, and that the district court erred in not granting an evidentiary hearing. They contend that such a hearing would have demonstrated that the administrative summonses were issued after the United States had formed an intention to prosecute the appellants for income tax evasion and fraud, and that therefore the evidence procured by the summonses was tainted and should have been suppressed, and a new trial granted.

## I.

Lawrence Forman and Lester Genser were, respectively, the president and vice president of Genser-Forman, Inc. (Corporation) from 1957 until early 1973. The Corporation was the sole distributor in the northeastern United States of Triumph cars and parts for British Leyland Motors, Inc. (British Leyland) until the Corporation was dissolved in 1973. The Corporation bought cars and parts from British Leyland and resold them to a network of automobile dealers located in its exclusive area of distribution. From 1969 to 1973, the years encompassed by the indictment, the Corporation purchased and imported approximately 6000 cars per year from British Leyland.

By contractual agreement between the Corporation and British Leyland, British Leyland bore all of the expenses of repair to "marine damage" to the cars occurring during their transportation from England to the United States. Although initially British Leyland reimbursed the Corporation for its actual repair expenses in accordance with an appraiser's estimate, after 1966 it followed a policy of paying the Corporation a fixed marine damage reimbursement of $36.00 for every Triumph delivered to the Corporation. In addition, British Leyland reimbursed the Corporation for repairs done by the Corporation under warranty, for obsolete parts returned to British Leyland by the Corporation, for discontinued models of automobiles remaining in inventory, for

one-third of the Corporation's advertising costs, and for part of the rental expenses of a New York City showroom. Dealers to whom the Corporation distributed Triumph cars reimbursed the Corporation for its transportation expenses.

The charges brought against appellants stem from their handling of these funds. From 1967 until early 1973, the moneys received from British Leyland and the Triumph dealers were deposited, pursuant to the directions of Genser and Forman, in a corporate account maintained in the name of Genser-Forman, Inc., in the City National Bank of Hackensack (Hackensack Account). These funds were kept separately from other funds of the Corporation, which were kept in the First National State Bank, Millburn-Short Hills Branch. Genser and Forman were the only signatories on the Hackensack Account.

From 1969 to 1973, the period encompassed by the indictment, nearly $2,200,000, representing sums paid to the Corporation from British Leyland and the dealers, was diverted to the Hackensack Account. None of the Corporation's books and records, and none of its tax returns, reflected any of these funds. Nor were the Corporation's accountants aware that the Corporation had such funds, either as income or as offsets to deducted expenses; the accountants did not perform audits of the Corporation's expense accounts and ledgers, but merely assembled books and records prepared by the Corporation from which the Corporation's tax returns were prepared. Had the accountants been aware of the funds and the sources thereof, the funds would have either increased the Corporation's cash account or decreased an expense account, with the result that the Corporation's profits would have been greater and its federal income tax liability larger. The government calculated that for the years 1970 to 1973, inclusive, the Corporation had an additional tax liability of $884,487.02 and additional gross profits of $1,830,267.76.[1]

---

1. Although appellants do not contest the sufficiency of the evidence relating to their convictions on the *corporate* tax evasion counts, they

do suggest, but only in their statement of facts, that the government offered no proof that the Corporation had deducted on its books and

The funds deposited in the Hackensack Account were used by the appellants to purchase a variety of tax-exempt municipal bearer bonds through third party nominees. From 1969 to 1973, a total of $2,084,975.34 —representing more than 100 bond transactions—was withdrawn from the Hackensack Account to effectuate the purchase of the bonds, which were kept in corporate safe deposit boxes in the Millburn-Short Hills branch of the First National State Bank. The books, records, and tax returns of the Corporation never reflected the acquisition of the bonds, and the Corporation's accountants were never informed that the bonds were purchased. On the theory that the appellants had appropriated the corporate moneys in the Hackensack account to their own use by purchasing bonds for their own benefit, and that these moneys thus represented unreported income to the appellants, the government calculated that from 1969 to 1972, inclusive, Genser had additional personal taxable income of $1,108,438.81 and additional tax liability of $777,777.64, while Forman had additional personal taxable income of $914,107.36 and additional tax liability of $645,355.69.[2]

In early 1973 British Leyland abandoned its distributorship arrangement and bought out the Corporation. Following the acquisition, the Corporation, pursuant to § 337 of the Internal Revenue Code, liquidated and distributed all of its assets. As a result of the liquidation all assets of the Corporation became the sole and exclusive property of Genser and Forman and came under their personal dominion and control between October 1972 and October 1973.

## II.

Appellants argue that the evidence was insufficient to support their convictions on personal income tax evasion in that the government failed to prove beyond a reasonable doubt that they exercised personal dominion and control over the funds in the Hackensack Account and the proceeds thereof (the bonds) prior to the liquidation of the Corporation. Specifically, they contend that the bulk of the government's proofs establish only that appellants exercised personal dominion and control over the bonds *after* the Corporation was liquidated (at which point, they stress, the Corporation's assets were rightfully theirs),[3] and that the government on the whole failed to show by documentary evidence any exercise of personal dominion and control prior to the Corporation's liquidation.

Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we think that the evidence is sufficient to secure appellants' convictions. Rather than detail all the evidence presented on this issue, we think it sufficient to cite the following in support of our conclusion:

(1) More than 100 bond purchase transactions were paid for with funds from the

records expenses for which it later received reimbursement. In fact, the only deductions taken by the Corporation for repair of marine damage during the relevant period was the salary of two body shop employees, totaling $22,500 per year. The government, however, argues that it was trying not a net worth method of proof case, but rather a specific items method of proof case, under which it is sufficient to show that contrary to usual practices a defendant received certain payments in cash which were not in turn reported on income tax returns. *See, e. g., United States v. Bray*, 546 F.2d 851 (10th Cir. 1976); *United States v. Stein*, 437 F.2d 775 (7th Cir.), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).

**2.** The government introduced Exhibit G–59, which attributed in summary fashion the vari-

ous bonds purchased with funds from the Hackensack Account to either Genser or Forman, or to both. The exhibit was based upon bank statements reflecting withdrawals from the Hackensack Account, bond purchase documentations obtained from the various brokerage houses, coupon collection letters of the First National State Bank in Millburn which recorded bond coupon negotiations by the appellants (Exhibit G–26), and the testimony of witnesses who had received bonds or coupons from the appellants.

**3.** The government, however, contends that the liquidation itself was improper because none of the bonds were reflected on the closing tax returns in 1973.

Hackensack Account. Virtually all these purchases were tied back to the Hackensack bank statements by the amount appearing on the bond purchase documentations, which also indicated the types of bonds acquired and the serial numbers. The government also introduced coupon collection letters (Exhibit G–26), which recorded bond coupon negotiations by the appellants prior to liquidation of the Corporation. More than one-half of the transactions were further linked to appellants by interest coupons cashed or otherwise used by them or their relatives bearing the same serial numbers as the bonds purchased with the Hackensack moneys. Although, as appellants stress, the coupons actually introduced at trial by the government were dated and cashed at various times *after* liquidation, testimony established that within one year after coupons have been negotiated, they are destroyed by the paying agent, bank, or issuing authority. We think that, considering the other evidence of appellants' pre-liquidation dominion and control, reviewed *infra*, the trial court did not abuse its discretion in admitting coupons cashed after 1973, the only coupons which the government could physically produce.

To take but one example, the evidence shows that on March 26, 1971, four bonds, The Board of Education of the Township of Union, New Jersey, serial numbers 723 through 726, were purchased from Hanauer, Stern & Co. for $15,793.44. The Hackensack bank statement recorded a withdrawal on March 30, 1971, of $15,793.44. Each of the four bonds bore numerous coupons, each worth $102.50, payable every six months. According to the coupon collection letters, every six months, from 1971 onward, $410.00 (4 × $102.50) was charged to appellants' personal account. Although the collection letters contain the name of the depositor, the issuing authority, and the value of the coupons, they do not list the serial numbers of the coupons or bonds being negotiated. Because, as stated, coupons are destroyed within one year after negotiation, the only coupons physically produced by the government in connection with these particular bonds were dated

February 1976, long after liquidation. Appellants thus argue that due to the lack of serial numbers on the coupon collection letters, and due to the lack of coupons cashed prior to liquidation, the government failed to prove that coupons negotiated by them prior to liquidation came from the specific bonds purchased with Hackensack funds in 1971. However, we think that in light of all the evidence introduced, this was a matter for the jury.

(2) The Corporation's tax returns from 1969 to 1973 failed to reflect the existence of the Hackensack Account or the bonds purchased therewith either in the asset column of the balance sheet under "Government obligations" or in Schedule M–1, 7, "Tax-exempt interest."

(3) The manner in which the bonds were purchased suggests that appellants did not regard them as Corporate property even at the time of their purchase. Appellants' orders for bonds were placed by third parties for customer's accounts which did not indicate the customer's name. With respect to certain bonds purchased for Genser through an officer of the City National Bank in Hackensack, normal banking procedures regarding purchase and delivery of the bonds apparently were not followed; although the bank maintained a bound volume in which all bond purchases were listed along with the purchaser's signatures, information relative to Genser's purchases were kept in a separate file maintained only for him. Moreover, several purchases were apparently designed to be divided equally between Genser and Forman; on numerous occasions, where two purchases of bonds from the same issuer had slightly different purchase prices, a check for the exact difference made payable to cash and signed by Genser or Forman would be issued on the Hackensack Account in order to equalize appellants' holdings. One purchase executed for Genser in 1967 included a change of order slip directing the investment company to split the purchase equally in two; thereafter, both appellants negotiated coupons from this bond.

(4) Appellants concede that in *1970 or 1971*, Richard Genser, appellant Genser's son, received several $5000 New Jersey Turnpike Authority bonds as a gift from his father. The bonds, which bore serial numbers 11499–11507, were admitted into evidence. Other evidence established that these bonds were purchased with funds from the Hackensack Account in 1970. On July 15, 1975, Richard Genser cashed six $130 coupons, number 14 in the coupon series, from these same bonds. Furthermore, Richard Genser testified that in *1972 or 1973* he borrowed New Jersey Turnpike Authority bonds, in the face amount of $30,000 or $35,000, from his father as collateral for a loan at First National State Bank. He indicated that he believed the bonds to be the same type as those he had received as a gift from his father in 1970 or 1971.

(5) John Genser, another of appellant Genser's sons, testified that between *1968 and 1970*, he received coupons, totaling $4035 annually, from New York Port Authority bonds held by his father, and that he, John, cashed the coupons and received the proceeds. In 1973 or 1974 he received from his father the same bonds (with a face value of $120,000) from which those coupons had been clipped. The record shows that New York Port Authority bonds were among those purchased with money from the Hackensack Account. John Genser testified that he accompanied his father to the First National Bank in Millburn on one occasion, and that his father may have gotten the bonds there and later given them to him at home.

(6) Samuel Albanese, a bank officer at the First National State Bank, Millburn-Short Hills branch, testified that (at an unspecified time) proceeds of coupons were deposited by Genser in his personal account at that bank. Bank records demonstrate that *prior* to 1973 at least some of the deposits took place shortly after Genser had access to the safety deposit boxes which were maintained by the Corporation at the bank and which appellants concede were used to store the bonds. The government produced numerous coupons from bonds purchased with money from the Hacken-

sack Account, which were negotiated by Genser at the First National Bank during 1975 and 1976.

## III.

■ The appellants argue that it was error for the trial judge to allow Special Agent Dorgeval to testify as an expert witness about his opinions concerning the results of an IRS audit of the appellants' records, since Dorgeval did not participate in or supervise the audit and the audit itself was not introduced into evidence. Dorgeval testified, *inter alia*, that based upon his own examination of the Corporation's books and records, the money placed by the appellants into the Hackensack account constituted unreported income. While the record is unclear as to whether Dorgeval relied upon an audit conducted solely by other agents, which audit was not admitted into evidence, assuming *arguendo* that he had done so, his testimony would not have been rendered inadmissible.

Federal Rule of Evidence 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *Id.* The testimony adduced from Dorgeval, even if partially based upon hearsay, was in compliance with the rule. The principal question is whether any out-of-court statements and reports relied upon by the expert are such that he can reasonably rely upon them and whether his reliance is reasonable under the facts of the case. 3 *Weinstein's Evidence,* ¶ 703[03]; *United States v. Sims,* 514 F.2d 147, 149 (9th Cir. 1975). We fail to discern any abuse of discretion by the trial judge in allowing Dorgeval to rely in part—if he did—upon the government audit in reaching his conclusions, especially since the appellants attack the reliability of the audit papers primarily on the ground that IRS

agents acted improperly in issuing administrative summonses.[4]

The appellants urge that because the audit papers were not admitted into evidence and because the government did not use the testimony of the agents who did prepare the audit, they were denied the right to cross-examine the auditing agents' conclusions and underlying documentation. However, the confrontation clause does not by itself prohibit the use of hearsay testimony. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Rather, it focuses upon the right of the accused to " 'confront and probe each of his accusers.' " *United States v. Williams*, 447 F.2d 1285, 1289 (5th Cir. 1971) (footnote and citation omitted). Here, at the most, Dorgeval was testifying to his own opinion, based upon the audit, and the appellants had a full opportunity to confront his opinions and reduce their impact in any manner available, including questioning his reliance upon the audits without having been involved in the auditing process himself. *See Williams, supra,* at 1288–90.

4. It is unclear whether appellants are suggesting that, in general, IRS conduct in this case is not to be trusted, or that the allegedly illegal summonses were used to obtain documents upon which the audit was based.

5. Although no evidentiary hearing was ever held, appellants contended in the district court, and allege on appeal, that in 1971 the IRS began an audit of the books and records of the corporation for the taxable years 1969 and 1970. The audit resulted in a finding of no deficiency for both years. On November 14, 1974, the IRS began a second investigation, pursuant to 26 U.S.C. § 7605(b), into taxable years 1969 and 1970 as well as into taxable years 1971–1974. Throughout the second investigation, in 1974 and 1975, Special Agents of the IRS served administrative summonses, issued under the authority of 26 U.S.C. § 7602, to the following persons and corporations: (1) several summonses were served on the corporation's accountant between August 1974 and January 1975 to produce the corporation's work papers; (2) the First National State Bank of New Jersey received at least eight summonses between November 1974 and January 1975, as well as one summons not bearing a date; (3) summonses of unknown number and date were served on the City National Bank in Hackensack; (4) a summons was issued to one Stan

We conclude that no error was committed by the trial judge in admitting Dorgeval's testimony.

IV.

Appellants contend that portions of the evidence upon which their convictions were based were obtained by means of illegally issued Internal Revenue Service (IRS) administrative summonses and thus should have been excluded by the trial court along with the tainted fruits thereof. They also assign as error the trial court's refusal to hold an evidentiary hearing to determine whether the administrative summonses, served on third parties pursuant to 26 U.S.C. § 7602, were issued in good faith and prior to a recommendation of criminal prosecution.[5]

Section 7602, 26 U.S.C. § 7602, permits the IRS to issue summonses to persons to obtain testimony and documents for the limited purpose "of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability."[6] In *Donaldson v. United States,*

Kramer on October 30, 1975, to testify on November 18, 1975. Appellants allege that additional summonses were issued to other persons and entities, but stress that there is no record to establish the identities of the parties and the dates of issuance.

6. Section 7602 provides in pertinent part: "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized— * * * (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other purpose the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry . . . ."

400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), the Supreme Court, interpreting its earlier decision in *Reisman v. Caplin*, 375 U.S. 440, 446, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964), held that "under § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution." *Id.* 400 U.S. at 536, 91 S.Ct. at 545. Accordingly, at several stages during the proceedings below, appellants sought an evidentiary hearing to determine whether the IRS had complied with these requirements.[7] They contended that if the summonses failed to meet the standards set forth in *Donaldson*, any evidence used at trial which was acquired by means of the summoned information should be suppressed. In denying the appellants' motions to suppress and to hold an evidentiary hearing, the trial judge ruled, *inter alia*, that appellants had failed on the record to demonstrate any abuse of process and that even if their allegations could be fully substantiated at an evidentiary hearing, appellants lacked standing to assert their claims under the principles recently announced in

*United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

The question of whether or not a taxpayer has standing at trial to attack the validity of a § 7602 summons issued to third parties who voluntarily complied and to have the fruits of an improper summons excluded from evidence has never been addressed directly by this court or by the Supreme Court insofar as we are aware. Previous decisions, of course, have established that the person to whom a summons is issued, whether the taxpayer or a third party, may refuse to comply with the summons, thereby triggering judicial enforcement proceedings at which the legality of the summons can be determined. *Reisman v. Caplin, supra; Donaldson v. United States, supra.*[8] Where an administrative summons is issued to a third party, such as the taxpayer's bank, the taxpayer may attempt to restrain voluntary compliance by the third party,[9] assuming that he is aware of the issuance of the summons prior to compliance,[10] and he may challenge the validity of the summons by attempting to

---

7. Subsequent to pleading not guilty, appellants filed a motion, argued before the district court on July 26, 1976, to suppress all evidence gained by the government through the use of any illegally issued summonses. Appellants also requested an evidentiary hearing to determine conclusively the facts surrounding the issuance of the summonses. The district court denied the motion to suppress and refused to grant an evidentiary hearing. The request for a hearing was renewed by letter dated August 16, 1976. Following their convictions, appellants, on January 5, 1977, again petitioned for a hearing. On February 4, 1977, the trial judge filed a letter opinion denying appellants' request on the grounds, *inter alia*, that the district court no longer had jurisdiction over the matter, *United States v. Ellenbogen*, 390 F.2d 537, 542–43 (2d Cir. 1968), *cert. denied*, 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1969), and that in any event appellants lacked standing to attack the validity of the summons.

8. Section 7602 does not provide the IRS with the power to enforce its own summonses. To compel compliance with a summons, the IRS must bring an enforcement proceeding in a federal district court. 26 U.S.C. §§ 7402(b), 7604(a). Such an enforcement action is "an adversary proceeding affording a judicial determination of the challenges to the summonses

and giving complete protection to the witness." *Reisman v. Caplin, supra*, 375 U.S. at 446, 84 S.Ct. at 512.

9. This procedure was suggested by the *Reisman* court, which held that "third parties might intervene [in enforcement proceedings] to protect their interests, or in the event the taxpayer is not a party to the summons before the hearing officer, he too may intervene. . . . Nor would there be a difference should the witness indicate . . . that he would voluntarily turn the papers over to the Commissioner. If this be true, either the taxpayer or any affected party might restrain compliance . . . until compliance is ordered by a court of competent jurisdiction." 375 U.S. at 449–50, 84 S.Ct. at 514 (citations omitted); *see Donaldson v. United States, supra*, 400 U.S. at 519–20, 91 S.Ct. 534; *Callahan v. First Pennsylvania Bank*, 422 F.Supp. 1098 (E.D.Pa.1976).

10. Prior to the recent enactment of 26 U.S.C. § 7609 (*see* note 11 *infra*), the IRS was not required to give notice to the taxpayer under investigation that a summons had been served on a third party. *United States v. Continental Bank & Trust Co.*, 503 F.2d 45 (10th Cir. 1974); *Application of Cole*, 342 F.2d 5 (2d Cir. 1965).

intervene in the ensuing enforcement proceedings.[11]

As for the grounds upon which the person summoned or the intervenor may attack the summons in the enforcement proceeding, *Reisman* held that one proper defense is "that the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution." 375 U.S. at 449, 84 S.Ct. at 513. This statement was construed in *Donaldson* to mean that judicial enforcement of a summons may be denied only where the *sole* object of the investigation is to gather data for a criminal prosecution, *id.* 400 U.S. at 553, 91 S.Ct. 534, and that a summons would thus be enforced if issued in "good faith" and "prior to a recommendation for criminal prosecution." *Id.* at 536, 91 S.Ct. at 545.

Most recently, in *United States v. LaSalle National Bank*, —— U.S. ——, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court explained the *Donaldson* test as follows:

> In summary, then, several requirements emerge for the enforcement of an internal revenue summons. First, the summons must be issued before the Service recommends to the Department of Justice that a criminal prosecution, which reasonably would relate to the subject matter of the summons, be undertaken. Second, the Service at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602. This second prerequisite requires the Service to meet the *Powell* standards of good faith.[12] It also requires that the Service not abandon in an institutional sense . . . the pursuit of civil tax determination or collection.

*Id.* at ——, 98 S.Ct. at 2368, (footnote omitted). Thus, according to *LaSalle,* the IRS may not in good faith, by means of § 7602 summonses, gather evidence solely for a criminal investigation.[13] Whether an investigation has solely criminal purposes is to be determined not merely by reference to the intent of the agent issuing the summons, but by "an examination of the institutional posture of the IRS." *Id.*[14]

---

11. The taxpayer's right to intervene in enforcement proceedings is permissive only and not mandatory. *Donaldson v. United States, supra*, 400 U.S. at 529–31, 91 S.Ct. 534. However, under 26 U.S.C. § 7609, added by the Tax Reform Act of 1976 (Pub.L. 94–455, 90 Stat. 1699–1702), taxpayers must be notified by the IRS that a summons has been issued to a third party and they are entitled as of right to stay voluntary compliance and to intervene in enforcement proceedings. Section 7609 applies only to summonses issued after February 28, 1977, and is thus inapplicable to the instant case. Pub.L. 94–455, § 1205(c), as amended by Pub.L. 94–528, § 2(b), 90 Stat. 2483.

12. In *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the Court stated that the IRS "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed." *Id.* at 57–58, 85 S.Ct. at 255.

13. Although it emphasized the interrelated criminal and civil nature of IRS investigations, the Court stated: "The Service does not enjoy inherent authority to summon production of the private papers of citizens. It may exercise only that authority granted by Congress. In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for 'ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability.' Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. Consequently, summons authority does not exist to aid criminal investigations solely. . . . We . . . could uncover nothing in the Code or its legislative history to suggest that Congress intended to permit exclusively criminal use of summonses. As a result, the IRS employs its authority in good faith when it pursues the four purposes of § 7602 which do not include aiding criminal investigations solely." —— U.S. at —— n.18, 98 S.Ct. at 2367.

14. Determining that "[n]othing in § 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of criminal accusation," *id.* at ——, 98 S.Ct. at 2365, the Court stressed that the IRS would not be proceeding in good

In *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975), this court carefully formulated procedural guidelines for use in enforcement proceedings and provided that an evidentiary hearing is an "integral part" of those proceedings. Under *McCarthy*, the IRS must be prepared to make a preliminary showing that the investigation has a legitimate purpose and that the inquiry may be relevant to that purpose, that the information sought is not already in the government's possession, and that the government has followed the procedural steps required by the Internal Revenue Code. The burden then shifts to the opposing party to establish any defenses or to prove that enforcement would constitute an abuse of the court's process.[15] If the district court concludes that it cannot fairly decide the case on the record before it, it may direct further proceedings, including discovery, if requested. *Id.* at 372–73. *See United States v. Cortese*, 540 F.2d 640 (3d Cir. 1976); *United States v. First National State Bank of New Jersey*, 540 F.2d 619 (3d Cir. 1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977); *United States v. Lafko*, 520 F.2d 622 (3d Cir. 1975).[16] Other courts have established similar procedures. *See United States v. Wright Motor Company*, 536 F.2d 1090 (5th Cir. 1976); *United States v. Zack*, 521 F.2d 1366 (9th Cir. 1975); *United States v. Church of Scientology*, 520 F.2d 818 (9th Cir. 1975); *United States v. Turner*, 480 F.2d 272 (7th Cir. 1973); *United States v. Salter*, 432 F.2d 697 (1st Cir. 1970).

In the instant case, however, none of the third parties upon whom summonses were served contested their validity in court. Because the third parties voluntarily complied with the summonses, no enforcement proceedings were ever instituted by the IRS. Moreover, since appellants, at least in most instances, apparently had no knowledge that summonses had been issued until after the third parties had complied,[17] they were unable to stay compliance and thereby necessitate the institution of enforcement proceedings in which they might have intervened.

Nevertheless, appellants rely upon *Donaldson v. United States* and *United States v. Friedman* for the proposition that even where the third party voluntarily complies with a § 7602 summons, the taxpayer's right to challenge the validity of the summons is preserved at the trial level. In *Donaldson*, the IRS issued § 7602 summonses to Donaldson's former employers for the production of the employers' business records relating to Donaldson's employment. Donaldson obtained a court order staying compliance by the third parties. The IRS sought judicial enforcement of the summonses, and Donaldson moved to intervene, alleging in part that the IRS investigation was criminal in nature. The Court upheld the district court's denial of Donaldson's motion to intervene on the grounds that intervention was a permissive, not a mandatory right, and that Donaldson's interest, when balanced against the need to facilitate

---

faith if it delayed in submitting a recommendation to the Justice Department when there was an institutional commitment to make the referral and the IRS merely desired to gather additional evidence for the prosecution, or if the IRS became "an information gathering agency for other departments including the Department of Justice, regardless of the status of criminal cases." *Id.* at ——, 98 S.Ct. at 2367.

15. The burden is on the taxpayer to negate the existence of a proper civil purpose. *United States v. Fisher*, 500 F.2d 683 (3d Cir. 1974), *aff'd* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Bowman*, 435 F.2d 467 (3d Cir. 1970); *United States v. DeGrosa*, 405 F.2d 926 (3d Cir.), *cert. denied*, 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969). The Supreme Court has characterized this burden as

"heavy." *United States v. LaSalle National Bank, supra*, —— U.S. at ——, 98 S.Ct. 2357.

16. The *McCarthy* court stated: "Although our proposed procedure for summons enforcement contemplates that provision for an evidentiary hearing be an integral part of the proceedings, implicit in our design is the realization that not every summons enforcement proceeding will require an evidentiary hearing. Thus, if the person summoned neither puts in issue allegations of the complaint nor raises proper affirmative defenses, no evidentiary hearing will be required; the matter can be decided on the pleadings." 514 F.2d at 373.

17. *See* note 30 and accompanying text *infra*.

IRS investigations, was of insufficient magnitude to warrant intervention: "Donaldson's only interest—and of course it looms large in his eyes—lies in the fact that those records presumably contain details of Acme-to-Donaldson payments possessing significance for federal income tax purposes. This asserted interest, however, is nothing more than a desire by Donaldson to counter and overcome Mercurio's and Acme's willingness, under summons, to comply and to produce records. The nature of the 'interest' urged by the taxpayer is apparent from the fact that the material in question (once we assume its relevance) would not be subject to suppression if the government obtained it by other routine means, such as by Acme's independent and voluntary disclosure prior to summons, or by way of identifiable deduction in Acme's own income tax returns, or through Mercurio's appearance as a trial witness, or by subpoena of the records for trial. This interest cannot be the kind contemplated by [Federal Rule of Civil Procedure] Rule 24(a)(2) when it speaks in general terms of 'an interest relating to the property or transaction which is the subject of the action.' What is obviously meant there is a significantly protectable interest." 400 U.S. at 531, 91 S.Ct. at 542. However, the Court continued: "And the taxpayer, to the extent that he has such a protectable interest, as, for example, by way of privilege, or *to the extent he may claim abuse of proc-*

*ess, may always assert* that interest or *that claim in due course at its proper place in any subsequent trial. Cf. United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)." *Id.* at 531, 91 S.Ct. at 542 (emphasis added). Thus, the *Donaldson* Court, in its effort to facilitate the investigatory mandate of the IRS, merely postponed until trial the time at which a taxpayer can demand adjudication of the propriety of a third party summons.[18]

In *Friedman,* the IRS brought an enforcement action to compel compliance with summonses issued to third parties in connection with an investigation into taxpayers' liability. The taxpayers were permitted to intervene, and they attempted to resist enforcement on the ground that the summonses sought evidence for a criminal prosecution. The district court ordered the summonses enforced and the taxpayers appealed. The taxpayers were unable to obtain a stay of the enforcement orders pending appeal and the third parties complied with the summonses. Because of this compliance, the IRS moved to dismiss as moot the appeal from the enforcement orders. In refusing to dismiss the appeal, this court stated: "Although Friedman has complied with the court's order, the legality of that order is still being challenged by the taxpayer intervenors. *If the taxpayers were to prevail in their contention that all summonses were illegal because they were is-*

---

**18.** Several courts have perceived that the *Donaldson* Court's recognition that the taxpayer can raise his claims of abuse of process at trial was a significant factor in its decision to limit his opportunity to raise those claims during the investigatory stage. In *Garrett v. United States,* 511 F.2d 1037 (9th Cir. 1975), the district court denied the taxpayers permission to intervene in an enforcement action brought by the IRS to compel compliance with a summons served on the taxpayers' bank. In affirming, the Court of Appeals for the Ninth Circuit stated that the district court "was not required to allow intervention, and the attendant discovery procedures necessary to support the allegations, to delay the investigation into taxpayers' tax liabilities, *because,* as the Court pointed out in *Donaldson,* 'the taxpayer, to the extent . . . that he may claim abuse of process, may always assert . . . that claim in due course at its proper place in any subsequent trial.'"

*Id.* at 1038 (emphasis added). Moreover, the court in *United States v. Newman,* 441 F.2d 165 (5th Cir. 1971), in denying the taxpayer's motion to intervene in enforcement proceedings, noted that in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the Court analogized an investigation by the IRS to one conducted by a grand jury or the Federal Trade Commission in that a person can be denied certain adjudicatory rights in light of the government's need to investigate and inquire. But the *Newman* court continued: "An important factor back of this approach is of course the fact that if accusatory proceedings are begun the person concerned 'will be accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding . . . .' And this applies in the context of an IRS summons situation as *Donaldson* makes clear." *Id.* at 174 (citations omitted).

sued *solely to gather evidence for use in a criminal prosecution, then the records acquired from Friedman would have been obtained unlawfully. Such a ruling could affect the possible use of these records in any subsequent criminal or civil proceeding brought against the taxpayers. . . .* We conclude that the motion to dismiss the appeal . . . should be denied because the controversy over these records is still very much alive." 532 F.2d at 931 (emphasis added).

Although the trial judge in the instant case conceded that appellants' claims may have been viable prior to the Supreme Court's decision in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), he held that *Miller* deprived appellants of any standing which they might claim under *Donaldson* and *Friedman* to assert at trial that administrative summonses directed to third parties who voluntarily complied were legally defective. In *Miller,* respondent made a pretrial motion to suppress copies of bank records relating to his accounts at two banks, both of which maintained the records pursuant to the Bank Secrecy Act of 1970 (Act), on the grounds that the grand jury subpoenas *duces tecum* used to obtain the records were defective [19] and that the records had thus been seized in violation of the Fourth Amendment. The district court denied the motion to suppress, but the court of appeals reversed, holding that a depositor's Fourth Amendment rights were violated when bank records maintained under the Act are obtained by means of a defective subpoena and that evidence so obtained must be suppressed. The Supreme Court reversed on the ground that the Act created no Fourth

Amendment rights in the depositor and that therefore respondent possessed no Fourth Amendment interest that could be vindicated by a challenge to the subpoenas.[20] The Court stated: "Since no Fourth Amendment interests of the depositor are implicated here, this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued. *California Bankers Assn. v. Shultz,* 416 U.S. 21 at 53, 94 S.Ct. 1494, 39 L.Ed.2d 812; *Donaldson v. United States,* 400 U.S. 517, 537, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) (Douglas, J., concurring). Under these principles, it was firmly settled, before the passage of the Bank Secrecy Act, that an Internal Revenue Service summons directed to a third-party bank does not violate the Fourth Amendment rights of a depositor under investigation. See *First National Bank v. United States,* 267 U.S. 576, 45 S.Ct. 231, 69 L.Ed. 796 (1925), aff'g 295 F. 142 (S.D.Ala.1924). See also, *California Bankers Assn. v. Shultz, supra,* 416 U.S. at 53, 94 S.Ct. 1494; *Donaldson v. United States,* 400 U.S., at 522, 91 S.Ct. 534." 425 U.S. at 444, 96 S.Ct. at 1624. In holding that respondent lacked "the requisite Fourth Amendment interest" to contest the validity of the subpoenas, the Court noted that there was "no occasion for us to address whether the subpoenas complied with the requirements outlined in *Walling.* The banks upon which they were served did not contest their validity." *Id.* at 446 n.9, 96 S.Ct. at 1626.[21]

The trial judge in the instant case characterized *Miller* as a "standing" case and

---

**19.** Respondent argued that the subpoenas were defective because they were issued by a United States Attorney rather than a court, no return was made to a court, and the subpoenas were returnable on a date when the grand jury was not in session. 425 U.S. at 439, 96 S.Ct. 1619.

**20.** The Court declined to consider the government's contentions that the appeals court erred in holding that the subpoenas were defective and that suppression was the appropriate remedy if a constitutional violation did occur. 425 U.S. at 440, 96 S.Ct. 1619.

**21.** In *Oklahoma Press Publishing Company v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the Court stated that "the Fourth [Amendment], if applicable [to subpoenas for the production of business records and papers], at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant." *Id.* at 208, 66 S.Ct. at 505.

ruled that just as *Miller*, in the absence of a constitutionally based interest, lacked standing to press his challenge to the validity of the subpoenas, so defendants herein "simply lack standing . . to assert a claim that an administrative summons directed at a third party (who thereafter complied voluntarily) was defective." According to the trial judge, any assertion of standing based upon *Donaldson* and *Friedman* was "washed away" in the wake of *Miller*. In so holding, the trial judge relied upon the recent decision of *United States v. Sand*, 541 F.2d 1370 (9th Cir. 1976), in which the Court of Appeals for the Ninth Circuit stated: "Both defendants sought to exclude Sand's bank records which the government obtained from several banks by using civil tax summonses. The crux of their objections was that the IRS investigation was from its inception criminal and that the use of IRC § 7602 summonses in aid of a solely criminal investigation was improper, citing *Donaldson v. United States*, 1971, 400 U.S. 517, 531–36, 91 S.Ct. 534, 27 L.Ed.2d 580. However, the Court held in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), that *a depositor has no standing to challenge an IRS summons directed at his bank. Id.* at [444], 96 S.Ct. 1619. Hence, the district court was correct in denying the motion to suppress." 541 F.2d at 1374 (emphasis added). *Cf. United States v. Herndon*, 536 F.2d 1027 (5th Cir. 1976).

We decide, however, that *Miller* does not deprive the appellants of standing in this case and that *Sand* erroneously misconstrued the breadth of *Miller*'s holding. The *Miller* court was not faced with the question of whether or not a taxpayer has standing to contest the legality of a § 7602 summons. Rather, *Miller* dealt only with a Fourth Amendment challenge to an allegedly improper grand jury subpoena. It appears that Miller's claim of defectiveness was intertwined with his Fourth Amendment argument,[22] and the Court appropriately framed its holding in constitutional terms.[23] Because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted," *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969), the Court did not have to reach the question of the validity of the subpoenas since only the banks, under a traditional Fourth Amendment analysis, had standing to raise it.[24]

In the instant case, however, appellants' standing to challenge administrative summonses derives not from the Fourth Amendment,[25] but rather from a federal statute, § 7602, and from the gloss placed upon that statute by the federal courts. We think that in consistently holding that the IRS may not use administrative sum-

---

**22.** As the *Miller* Court stated: "Respondent appears to contend that a depositor's Fourth Amendment interest comes into play only when a *defective* subpoena is used to obtain records kept pursuant to the Act. We see no reason why the existence of a Fourth Amendment interest turns on whether the subpoena is defective. Therefore, we do not limit our consideration to the situation in which there is an alleged defect in the subpoena served on the bank." 425 U.S. at 441 n.2, 96 S.Ct. at 1623.

**23.** Indeed, this court has described *Miller* as follows: "Miller urged that he had a *Fourth Amendment* interest in the records kept by the banks, as copies of personal records made available to the banks for a limited purpose. However, the Supreme Court, after considering the standards enunciated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 . . . and *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 . . . found *no legitimate expectation of privacy* in

the contents of records maintained by the banks under the mandate of the Act . . . .." *Gannet v. First National State Bank of New Jersey*, 546 F.2d 1072 (3d Cir. 1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977) (emphasis added).

**24.** In *Alderman v. United States, supra*, the Court stated that the "established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." 394 U.S. at 171–72, 89 S.Ct. at 965. *See United States v. Miller, supra*, 425 U.S. at 456, 96 S.Ct. 1619 (Marshall, J., dissenting).

**25.** Appellants expressly deny any Fourth Amendment interest in the summoned materials.

monses to gather evidence in an exclusively criminal investigation, the courts from *Reisman* and *Donaldson* onward, up to and including LaSalle, have identified a protectable interest in the taxpayer not to be the target of an exclusively criminal investigation in which government agents have acted beyond their statutory authority. If the civil limitation placed upon § 7602 summonses is not for the taxpayer's benefit, we have difficulty in discerning the party for whose protection it was designed. While the third party recipients of summonses may well be motivated to refuse to comply on the grounds that the summonses are overbroad or unreasonably burdensome, *see e. g., United States v. Friedman, supra*, at 931, 933–34; *United States v. Dauphin Deposit Trust Co.*, 385 F.2d 129 (3d Cir. 1967), *cert. denied*, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968), there is little reason to expect them to raise the defense that the summonses were issued to further a solely criminal investigation of the taxpayer. *Cf. United States v. Continental Bank & Trust Co.*, 503 F.2d 45 (10th Cir. 1974). This is not a matter of the third party bank's interest, but of the taxpayer's. Thus, the courts have provided that the taxpayer may challenge the validity of a summons issued to a third party either at the investigatory stage or, if necessary, at the trial level. *Reisman v. Caplin; Donaldson v. United States;*

*United States v. LaSalle National Bank; United States v. Friedman; United States v. Lafko; United States v. McCarthy, supra.*

■ As has frequently been noted, the rationale of these cases derives from the distinct roles traditionally accorded the investigatory functions of the grand jury, on the one hand, and the IRS, on the other hand. Grand jury subpoenas, such as those involved in *Miller*, are used to garner evidence to be presented to a federal grand jury, whose sole purpose is to investigate criminal activity. It is exclusively a criminal investigatory tool. But an IRS administrative summons is a process essentially civil in character. While a summons may result in obtaining evidence which might ultimately find its way to a grand jury, the statutory authority for its issuance is civil and the evidentiary objective at the time of its issuance must be civil in nature. Thus, the grand jury apparatus has traditionally been the means by which evidence required to form the basis of a contemplated criminal charge can be compulsorily produced, and the courts, in construing § 7602, have identified a protectable interest, assertable by the taxpayer, in preventing the IRS from encroaching upon what has traditionally been the sole province of the grand jury.[26]

---

**26.** In *United States v. Friedman*, this court, noting that the IRS has no authority to conduct a criminal investigation through the use of a § 7602 civil summons, explained as follows: "No court has given a thorough or persuasive justification for this construction of 26 U.S.C. § 7602 which appears to have originated in an opinion by Judge Wyzanski in *United States v. O'Connor*, 118 F.Supp. 248 (D.Mass.1953), and to have been assumed, rather than explained, ever since. Judge Wyzanski reasoned: 'The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure. That is the inquisitorial body provided by our fundamental law to subpoena documents required in advance of a criminal trial, and in the preparation of an indictment or its particularization . . . .' 118 F.Supp. at 250–51. The paragraph has a nice ring, but it ignores the reality that grand jury subpoenas are issued as a matter of course by the Depart-

ment of Justice, not by the grand jury. *See In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973). It is hard to imagine why Congress could not entrust criminal law enforcement of the Internal Revenue Code to an executive branch department rather than or in addition to the Justice Department. The difference between a summons returnable before an IRS agent and a subpoena returnable before a grand jury is in the real world slight.

"The critical question, however, is what Congress intended in § 7602 and its predecessors, as well as in 26 U.S.C. § 7801(a) which authorizes the Secretary of the Treasury to administer and enforce the provisions of the Internal Revenue Code. The Intelligence Division of the IRS is organized to carry out the broad enforcement responsibilities of the Treasury Secretary under § 7801(a). Since Judge Wyzanski's opinion in 1953, no case which has addressed the issue of the scope of a § 7602 summons has explored the legislative intention in any depth. Nor do we, since the *United States v. O'Connor*

Were *Miller* to be held dispositive of the present case, serious doubt would be cast upon those decisions, including *Donaldson* and *LaSalle,* which hold that IRS summonses are improper if used in furtherance of an IRS investigation conducted solely for criminal purposes, since, as stated above, that limitation makes little sense if the taxpayer—the only party properly motivated to challenge the summons on the ground of illegality—is not permitted to do so. *Miller,* however, by its very terms suggests that it was not intended to disturb the vitality of *Donaldson.* The *Miller* Court referred to *Donaldson* only for the proposition that "an IRS summons directed to a third party bank does not violate the *Fourth Amendment* rights of a depositor under investigation." 425 U.S. at 444, 96 S.Ct. at 1624 (emphasis added). Even at the time *Donaldson* was decided, as the *Miller* Court notes, it was well established that the issuance of a summons to a third party does not violate the taxpayer's Fourth Amendment rights. *See Donaldson,* 400 U.S. at 522, 91 S.Ct. 534. *Donaldson* itself was a case involving no Fourth Amendment claims whatsoever. *Id.* Thus the *Miller* Court compared its ruling to *Donaldson* only in the sense that neither § 7602 summonses nor grand jury subpoenas issued to third parties are vulnerable to Fourth Amendment challenges by taxpayers. But *Miller* did not purport to cast doubt on *Donaldson's* conclusion that even where there is no Fourth Amendment challenge to a summons involved, "the taxpayer . . . to the extent he may claim abuse of process, may always assert . . . that claim in due course at its proper place in any subsequent trial."

Having concluded that *Miller* does not bar appellants' standing to assert at trial the illegality of § 7602 summons, we must next examine appellants' contentions that if, on remand, a hearing is granted and abuse of the summons process is found, the proper remedy is the suppression of any evidence and the fruits thereof obtained by virtue of the illegal summonses. The trial judge ruled, and the government contends on appeal, that the drastic remedy of suppression, controversial enough where constitutional violations are urged, is improper where the violations complained of are merely statutory in character. We think, however, that *Donaldson* and *Friedman,* cited by appellants, clearly envision such a remedy. In *Friedman,* this court stated that proof that a § 7602 summons had been invalidly issued "could affect the possible use [of the summoned records] in any subsequent criminal or civil proceeding brought against the taxpayers." 532 F.2d at 936. Moreover, *Donaldson* cited *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), as support for the proposition that the taxpayer could always assert a claim of abuse of process in any subsequent trial. 400 U.S. at 517, 91 S.Ct. 534. In *Blue,* the Court stated: "Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. While the general common-law practice is to admit evidence despite its illegal origins, this Court in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, *federal statutes,* or federal rules of procedure." 384 U.S. at 255, 86 S.Ct. at 1419 (citations omitted) (emphasis added).[27]

construction has been accepted by the Supreme Court. *See, e. g., Donaldson v. United States, supra,* 400 U.S. at 533, 91 S.Ct. 534." 532 F.2d at 932 n.9.

In *United States v. LaSalle National Bank, supra,* the Court emphasized that "[n]othing in § 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of

criminal accusation." —— U.S. at ——, 98 S.Ct. at 2365.

**27.** In one of the cases cited by *Blue* for this proposition, *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), evidence procured by wiretapping in violation of the Communications Act of 1934 was held inadmissible at trial. The *Nardone* Court stated: "Any claim for the exclusion of evidence logically

Other courts, as well, have found suppression to be a theoretically proper remedy to cure governmental violations of the Internal Revenue Code. In *United States v. Oaks*, 360 F.Supp. 855 (C.D.Cal. 1973), defendant taxpayer moved to suppress information acquired pursuant to § 7602 summonses on the ground that the summonses were employed for the improper purpose of furthering a solely criminal investigation. The court, without questioning the propriety of the remedy of suppression, denied the taxpayer's motion only because it found on the facts before it that the summonses complied with the *Donaldson* standards. *See United States v. Fruchtman*, 421 F.2d 1019 (6th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970). In *Application of Leonardo*, 208 F.Supp. 124 (N.D.Cal.1962), which involved a claim by taxpayers that the IRS had violated 26 U.S.C. § 7605(b), the court, in ordering suppression, held that "apart from the claim of violation of constitutional rights, it is our view that this court can and should grant relief through an adequate and appropriate remedy to safeguard these petitioners from what we deem to be an abuse of the statutory process." *Id.* at 126–27.[28] A similar view was espoused by the court in *United States v. Avila*, 227 F.Supp. 3 (N.D.Cal.1963), which stressed that "[a]lthough the so-called 'fruit of the poisonous tree' doctrine has generally been applied in cases involving searches in violation of the Fourth Amendment . . ., the doctrine can be applied to searches in

violation of a statutory right." *Id.* at 6, citing *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In an analogous context, the court in *Moloney v. United States*, 375 F.Supp. 737 (N.D.Ohio 1974), stated: "The Government also argues that [26 U.S.C. § 3631] does not contain any sanctions for such a violation as occurred here. The Court is not inclined to render the section nugatory because it does not state explicitly that no assessment of deficiency can be made on the basis of an inspection forbidden by the section. Such a result is implicit in the statute. Otherwise it would be completely meaningless." *Id.* at 741.

To make available the remedy of suppression to taxpayers in cases such as the present is merely to ensure governmental compliance with the principles enunciated in *Reisman, Donaldson, LaSalle*, and the decisions of this circuit: the IRS, in issuing administrative summonses under § 7602, may not act outside its statutory authority by garnering evidence in furtherance of a solely criminal investigation. If a court determines in the context of enforcement proceedings that a summons was illegally issued, it will deny enforcement of the summons. 400 U.S. at 533, 91 S.Ct. 534. That summons is no less illegal merely because it escapes detection at the investigatory stage. The prophylactic principles which operate at the enforcement level are equally appropriate to the trial stage, and suppression is the only practical remedy at that point to cure the statutory abuse.[29]

relevant in criminal prosecutions is heavily handicapped. It must be justified by an overriding public policy expressed in the Constitution or the law of the land. . . . [T]wo opposing concerns must be harmonized: on the one hand, the stern enforcement of the criminal law; on the other, protection of that realm of privacy left free by Constitution and laws but capable of infringement either through zeal or design. In accommodating both these concerns, meaning must be given to what Congress has written, even if not in explicit language, so as to effectuate the policy which Congress has formulated." *Id.* at 340, 60 S.Ct. at 267.

**28.** In *United States v. House*, 524 F.2d 1035 (3d Cir. 1975), this court declined to decide wheth-

er a violation by the government of § 7605(b) is a ground for a suppression motion in a criminal case because it found on the record that no § 7605(b) violation had occurred. *Id.* at 1043; *see United States v. Dawson*, 400 F.2d 194 (2d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

**29.** On several occasions the Supreme Court has stressed that a primary justification for the exclusionary rule, at least in the context of the Fourth Amendment, is the deterrence of illegal government conduct. *See, e. g., Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Suppression in cases

In an analogous situation, the Supreme Court stressed that the preliminary stages of criminal prosecutions must be pursued in strict obedience to both the Constitution and the laws of the United States. In *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Court was called upon by the defendant to adjudicate the claim that the government had used an administrative warrant, which could be used only to detain a person who was to be deported, for an entirely illegitimate purpose. The defendant asserted that the purpose was to place him in custody so that pressure might be brought to bear on him and to permit the government to search through his belongings for evidence of alleged espionage. The defendant argued that the articles seized as a consequence of the use of this illegal administrative warrant should have been suppressed. The Court stated: "Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States." 362 U.S. at 226, 80 S.Ct. at 690. The Court stressed that the issues were fully explored by the court below and crucial facts were found against defendant. Accordingly, it was precluded from making a finding of bad faith on that record. However, the Court again noted: "We emphasize again that our view of the matter would be totally different had the evidence established, or were the courts below not justified in not finding, that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding." *Id.* at 230, 80 S.Ct. at 692.

In sum, although § 7602 does not expressly restrict the power to issue a summons thereunder as long as the purpose is to ascertain the correctness of any return and the material sought is relevant to such inquiry, *LaSalle, Donaldson, Friedman,* and the other cited decisions have promulgated a judicial policy, binding on the IRS, to protect a taxpayer from any attempt on the part of the IRS to obtain evidence by use of § 7602 summonses after the IRS recommends prosecution to the Department of Justice or after the IRS has abandoned, in an institutional sense, the pursuit of civil tax determination or collection. The only effective remedy for violation of that policy is to require suppression of the evidence obtained as the evidentiary fruits of an illegal summons.

The government, however, contends that even if the remedy of suppression is theoretically available to taxpayers, it is an inappropriate remedy under the circumstances of this particular case. First, the government implies that appellants have "waived" any opportunity to seek suppression of evidence at trial because they knew of the issuance of at least some of the summonses prior to the third parties' compliance and failed to request the court to stay such compliance or to seek other judicial relief at that earlier stage. In *United States v. House, supra,* this court, considering a claim that evidence obtained in alleged violation of 26 U.S.C. § 7605(b) should be suppressed, stated: "Moreover, if the taxpayers had felt aggrieved by the proposed visits to Spuler's office or their own, they could have resisted them and forced

---

such as the present furthers this policy even though 26 U.S.C. § 7609, added by the Tax Reform Act of 1976, now statutorily provides an opportunity for targets of IRS investigations to intervene at enforcement proceedings and to have notice of summonses issued in connection with an investigation of his activities. Section 7609 does not explicitly speak to the taxpayer's rights at the trial level, but the legislative histo-

ry suggests that even if a taxpayer chooses not to intervene he may still raise his claims in a subsequent trial. *See* text accompanying note 31 *infra.* Thus, assuming that a taxpayer did not intervene at the investigatory stage, suppression at trial would be the only remedy capable of ensuring governmental compliance with § 7602.

the Internal Revenue Service to resort to a subpoena. If they had, they would have obtained judicial review of both the necessity for a notice and the propriety of a second examination. We can hardly countenance as a ground for suppression an examination to which the taxpayer, having available alternatives, consented." 524 F.2d at 1043–44.

■ The record in the present case is unclear as to the precise extent of appellants' knowledge of the issuance of the summons.[30] However, assuming *arguendo* that appellants were aware, prior to compliance, that summonses had been issued to third parties, and that they failed, intentionally or otherwise, to institute judicial proceedings at that point in time, we do not think this would necessarily bar them from asserting a claim of abuse of process at trial. *Donaldson* indicated that the taxpayer can attack the validity of the summons at trial even though he has sought and been denied intervention, and it nowhere suggests that the taxpayer must exhaust his pre-indictment remedies before proceeding at the trial level. *See Garrett v. United States*, 511 F.2d 1037 (9th Cir. 1975); *United States v. Newman*, 441 F.2d 165 (5th Cir. 1971). We note, in addition, that the Senate Report accompanying 26 U.S.C. § 7609, added by the Tax Reform Act of 1976, which gives taxpayers the statutory right to stay voluntary compliance and intervene in enforcement proceedings, states that where the taxpayer "*does not request* the third party witness not to comply at this stage, *he would still be permitted to assert such defenses* as may be available to him with respect to any evidence obtained pursuant to the summons in any later court action in which the [taxpayer] was directly involved (i. e., affecting his tax liability or any criminal charges which might be brought) *to the same extent as may be permitted under present law.*" Senate Report No. 94–938, 94th Cong., 2d Sess. 370 (1976) (emphasis added).[31]

Finally, the government asserts that as a practical matter suppression would gain the appellants nothing in the case. According to the government, grand jury subpoenas were issued to many, if not all, of the same parties who received administrative summonses. The only "taint" which the appellants can claim, urges the government, is that the "identities" of the subpoenaed third parties were learned by way of the summonses and that the subpoenas were therefore fatally infected. The government stresses that this claim is without merit because the fact that the summonses themselves were served on the third parties demonstrates that their identities were already known prior to the issuance of the summonses. However, the present record contains no complete accounting of the dates of

---

**30.** On January 17, 1975, prior to indictment, trial counsel for Forman wrote to the IRS Special Agent investigating their activities and requested that defendants be notified by the IRS of any summonses it intended to serve so that he could challenge them, if appropriate. On May 8, 1975, the Special Agent replied by letter that he would not advise appellants of any summonses issued to third parties. Nevertheless, the record of the pre-trial proceedings suggests that appellants were aware of some summonses prior to compliance and in time to attempt to institute the stay and intervention procedures outlined in *Reisman* and *Donaldson*. In the January 17, 1975, letter to the IRS, trial counsel for Forman stated that he had advised one of the third party banks not to comply with a summons dated January 13, 1975. It appears that no judicial action was ever initiated to restrain compliance. Moreover, on one occasion, counsel for Forman attempted to attend physically an IRS interview of the Corporation's accountant, who had been summoned to appear, but he was asked to leave. On the whole, however, appellants maintain that they had no knowledge of most of the summonses until after compliance and stress that even at this late date they have no precise indication as to whom and when all the summonses were served.

**31.** Similarly, one 1975 Congressional report, summarizing the administrative procedures of the IRS prior to the 1976 Tax Reform Act, states that "a taxpayer who *either does not attempt to intervene or restrain or who fails in his attempt* may assert his rights when the government subsequently attempts to use the material against him." Report on Administrative Procedures of the Internal Revenue Service to the Administrative Conference of the United States (October 1975), 94th Cong., 2d Sess. 755 (emphasis added).

the subpoenas or the summonses or of the parties on whom they were served. While the government may well be able to establish an independent, "taint-free" basis for its evidence, *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we are unable to so conclude on the record before us. "Statements made by counsel in their briefs are not evidence." *United States v. Howard*, 360 F.2d 373 (3d Cir. 1966).

We thus conclude that the trial judge erred in ruling that as a matter of law appellants lacked standing to attack the validity of the summonses and to suppress the illegally obtained evidentiary fruits thereof. Accordingly, in light of the allegations of governmental impropriety raised by appellants, we shall remand this case to the district court with instructions to conduct an evidentiary hearing [32] and to certify to this court its findings of fact and conclusions of law as to whether the government fully complied with the requirements of 26 U.S.C. § 7602, as judicially interpreted, and if not, whether suppression is required. We note that the trial judge did not have the benefit of the Supreme Court's opinion in *United States v. LaSalle National Bank* at the time he rendered his decision, and the

present record is insufficient to permit us to determine conclusively whether or not the IRS summonses were issued in good faith and prior to a recommendation for prosecution, as those standards are defined in *LaSalle*. Although the government has submitted evidence which allegedly obviates the need for an evidentiary hearing, this evidence apparently was not presented to the district court in the first instance and therefore cannot be considered by this court on appeal. *See Stotter & Co., Inc. v. Amstar Corp.*, 579 F.2d 13 (3d Cir. 1978) and the authorities cited in n.4 of *Rose Marie Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3d Cir. 1978).

The case will be remanded for prompt proceedings consistent with this opinion. We retain jurisdiction over this appeal.[33]

---

**32.** The government suggests that appellants may have waived their right to an evidentiary hearing by failing to object to the trial court's refusal of their request. The following colloquy occurred at the hearing on defendants' motion to suppress:

"Mr. Zuckerman: Your honor, I don't know whether it is appropriate or not, but in the event that there is error in any of your Honor's ruling, would it be appropriate to have evidential findings or to have a hearing before the trial in this case as to what the facts were, what was secured after the 6(e) order and what evidence was secured under the summonses after a certain date? Because I think—I can see an Appellate Court speculating as to what we are talking about?

"The Court: I know. I want to be fair. That is why I asked you whether you wanted anything more on the record. But you see I am in this position. It is very hard for me to make that kind of record pre-trial without conducting a pretrial trial.

"Mr. Zuckerman: That's correct, sir.

"The Court: *That would be a monumental waste of time in the event of an acquittal.*

"Mr. Zuckerman: *I recognize that. It would be a monumental waste of time for the Third Circuit to agree with you in the event of a conviction.*

"The Court: That's correct. If the Third Circuit disagrees with me, they would have the option of remanding it back for an evidential hearing on that limited question.

"Mr. Zuckerman: All right.

"The Court: I don't want to preclude you. Does that make sense to you?

"Mr. Zuckerman: *It makes sense to me. I'm content for the record to state that.*"
166a–168a (emphasis added).

However, in a letter to the trial judge dated August 16, 1976, prior to entry of the order of September 9, 1976, denying defendants' motion to suppress, Mr. Zuckerman explicitly renewed his request for an evidentiary hearing. 198a. We think that under the circumstances defendants properly voiced their objection and preserved their right to appeal the trial judge's denial of an evidentiary hearing.

**33.** See Internal Operating Procedures for the United States Court of Appeals for the Third Circuit, § L.