**YELLOW BAYOU PLANTATION, INC.,**
Plaintiff-Appellant,

v.

**SHELL CHEMICAL, INC. and Thompson-Hayward Chemical Company,**
Defendants-Appellees.

No. 73–1304.

United States Court of Appeals,
Fifth Circuit.

March 29, 1974.

Philip Mansour, Greenville, Miss., James A. Dooley, Chicago, Ill., for plaintiff-appellant.

Frank W. Hunger, J. A. Lake, Greenville, Miss., for Shell.

Allan D. Sheckel Ford, Jon M. Barnwell, Clarksdale, Miss., for Thompson.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

This diversity suit for damages against the manufacturer, Shell Chemical, Inc. (Shell), and a distributor, Thompson-Hayward Chemical Company (Thompson-Hayward), of an herbicide, Planavin, asserted its actionable failure to control various pest-grasses in plaintiff's soybean fields. Plaintiff, Yellow Bayou Plantation, Inc. (Yellow Bayou), advanced theories of negligence, misrepresentation, express and implied warranty, and intentional misconduct.[1] Trial to a jury resulted in special and general verdicts uniformly unfavorable to plaintiff and a consequent take-nothing judgment, which we affirm.

Plaintiff's 3,900-acre farm was plagued by weeds and by seedling and rhizome[2] Johnson grass. Plaintiff's professional manager decided to institute a program to control these for the 1971 crop year in hopes of better yield. After testing several herbicides, he settled upon Planavin, purchasing from Thompson-Hayward, sealed in containers as it came from Shell, an amount sufficient, if properly applied and functioning, to achieve the desired control in plaintiff's projected 1,400 acres of soybeans.

At trial, the evidence showed that in order to obtain proper results from the use of an incorporated pre-emergence herbicide such as Planavin it is vital to obtain uniform and dense coverage in the soil of the treated area. Such an herbicide must be minutely and densely dispersed below ground, so that as many as possible of the growing roots of pest-plants will make actual contact with a chemical particle. This contact arrests root growth. If sufficient of the plant's roots are affected, dessication follows and the plant dies. If coverage is not minutely dispersed and uniform, however, sufficient roots may miss actual

---

1. The applicable law was that of Arkansas, which did not recognize strict liability in tort.

2. Shell did not claim that Planavin would satisfactorily control this sort of Johnson grass, which grows from residual, root-like subterranean stems and is something of a different proposition from the annual crop of seedlings.

contact with herbicidal particles to support life and growth in the weed. In order to achieve maximum dispersal, the insoluble herbicide is ground into tiny particles, millions to a pound, and sprayed on the soil. Water is the vehicle, and a sufficient volume must be used to spread the particles far and wide.

Such herbicides may be applied either by aircraft or by "ground rig," but the dispersal characteristics of the two methods differ. Shell's label specifies a minimum of ten to twenty gallons of water per acre for ground rig, five for airplanes. Yellow Bayou sprayed 133 acres by airplane, using the five-gallon-per-acre prescription specified by Shell's label. On the major portion of its acreage, however, Yellow Bayou employed a formulation radically different from the label's instructions and what amounts to a third method of application, a novel type of ground rig—and thereby hangs the case.

This machine, called a Span Spray, operated differently from the conventional ground rig. Briefly speaking, the conventional machine employs spray nozzles on booms, dispersing liquid directly onto the soil at high volume and pressure. The Span Spray operates at lower pressure and volume, with its nozzles blowing into fans which, in turn, disperse the material. One characteristic of Span Spray application is a smaller spray droplet, more subject to drift and wind dispersal than the coarser mist produced by a conventional sprayer. There was testimony that the finer mist is most effective in application of insecticides, where a slow-settling, more fog-like spray operates to catch flying insects and settle through brushy growth. Reason indicates, and there was some testimony that, Span Spray's lower volume and the tendency of its finer spray to drift might well produce less of a dispersed and uniform fallout to the ground, the desideratum in herbicide applications. But the evidence was meager

regarding experience in herbicide application with Span Spray, which came into use only very recently.

Shell's label gave specific instructions for mixing Planavin with water for use:

. . . Shake Planavin 4 container well before using. Mix the required amount of Planavin 4 in sufficient water *(five gallons per acre minimum for aircraft application or ten to twenty gallons per acre minimum for ground rig)* to provide uniform spray coverage of the soil surface. Planavin 4 application to alfalfa and peas should be made by ground equipment. Agitation of the dilute mixture in the spray tank before the [sic] during application is recommended. Rinse container when empty and pour rinsings into spray tank. (emphasis added)

Yellow Bayou's manager, Williams, testified that he read these directions, but instead of using ten to twenty used 1¼ gallons of water per acre, believing he could so achieve uniform coverage with the Span Spray ground rig. So applied, Planavin produced a degree of weed control which was disputed, but at all events less than the ideal. Yellow Bayou's basic contention was that the herbicide was ineffective. Shell and Thompson-Hayward retorted, not so, you didn't follow directions.

There was evidence meeting Boeing v. Shipman[3] standards upon which the jury could have gone either way, and it went with Shell and Thompson Hayward. Yellow Boyou's various points to the effect that a verdict of liability should have been directed in its favor are without merit. Some of the countervailing evidence has been noted in the forepart of our opinion. In addition, there was testimony by qualified experts that it was simply impossible by any means to obtain uniform coverage by use of less than ten gallons of water per acre in ground applications of Planavin, that the Span Spray was fundamentally unsuited to application of such herbicides as Planavin, and that great

3. 411 F.2d 365 (5th Cir. 1969).

care was used in producing, inspecting and testing the herbicide. In addition, Yellow Bayou's manager admitted that even the Span Spray application improved yield and that the aircraft application improved it still more: untreated fields averaged about eighteen bushels per acre, Span Spray-treated areas about twenty-three, and air-sprayed ones about twenty-nine.[4]

In response to this proof, Yellow Bayou took a very broad-brush approach indeed: that *no* grass control was achieved, that because of its unique action Span Spray could not fail to achieve uniform coverage with about one-tenth of the volume of water specified in Shell's label, and that crops in which grass control is absent run from 25% to 75% of those in which it is achieved. Though these assertions pass lightly by various midly inconvenient facts, such as increased yield in fields where Planavin was applied in any manner whatever and the presence of rhizome Johnson grass which Planavin did not purport to control, they come down to an attempted circumstantial demonstration, which the jury might have accepted, that the Planavin supplied was defective as an herbicide. But the jury specially found it was not defective, on evidence at least as strong, a finding dispositive of all theories of negligence, warranty, etc.

■ As for Yellow Bayou's claim that the label somehow misrepresented matters by failing to make special provisions regarding use in Span Spray machines, despite Shell's and Thompson-Hayward's knowledge of their existence, there was no evidence that use of Planavin mixed in the label proportions would have been ineffective in the Span Spray ground rig. There was evidence indicating that use of such large volumes of water was impractical with the machine, which fact might well have caused Williams to conclude that application of Planavin with the machine should not be attempted since compliance with Shell's instructions was incompatible with its use. Shell's warranty expressly disclaimed, in accordance with Section 85–2–316 of the Arkansas Code, responsibility for use of Planavin otherwise than in accordance with the label instructions. Nevertheless, Williams placed his faith in Span Spray to achieve uniform coverage despite violation of Shell's plain mixing instructions for use with ground rigs—or even those for use with aircraft. The jury specially found that want of sufficient water caused the failure of uniform coverage, which in turn proximately caused the failure of weed control. Were we disposed to disturb this finding we could not, founded as it is in a reasonable reading of amply sufficient evidence.

■ Little remains. Yellow Bayou complains of the district court's overruling of its several exceptions to the jury charge and refusal to give various special instructions and interrogatories which it requested. The court's charge amply and, indeed, generously presented plaintiff's theories to the jury, and its instructions were correct and adequate. Complaint is made of the court's instruction to the jury presenting the Arkansas comparative negligence statute as applicable to breach of warranty, but Yellow Bayou could in no manner have been harmed by this in view of the special finding that no breach occurred.

■■ Four evidentiary rulings are also called in question. The court excluded the Span Spray manual offered by Yellow Bayou to buttress its assertions that 1¼ gallons of water applied by Span Spray was the equivalent of ten to twenty through a conventional ground rig. This was pure hearsay, offered not to show simply that it existed or under any exception to the rule but rather for the truth of the matter asserted, and was properly excluded. Likewise excluded was a list of lawsuits over, and com-

---

**4.** This testimony is roughly probative, though in logic subject to the familiar "compared-to-what" fallacy, the evidence indicating generally that the various fields were of different productivity even in an untreated state.

plaints to Shell about, Planavin, offered to show that Shell knew or should have known that Planavin was ineffective. The most that these items could have indicated was that absent third parties had made this claim to or against Shell from time to time. To exclude evidence of such faint probative value and high potential for unfair prejudice was well within the trial court's discretion.

 The court admitted various reports and records of tests on Planavin performed by the United States Department of Agriculture, by state universities, and by private institutions, as well as by Shell, taken from Shell's files. These were offered to show that Shell made reasonable inspections and tests of Planavin, an issue under Arkansas law.[5] These reports were admitted in connection with the testimony of Dr. Richard Baldwin, a qualified agronomist and expert on herbicides employed by Shell to do research and development work on Planavin. Their admission as business records rested on his testimony that he received and reviewed them in connection with his work, compiled data from them and submitted it to the U.S.D.A. in obtaining approval of Planavin's sale, and kept them in company files to which he had access. Since they were not all records of Shell's activities, no specific showing was or well could have been made that each was made in the regular course of business, nor of their reasonable contemporaneity with the events which they recorded, nor of their accuracy and the efforts employed to assure it. See United States v. Blake, 488 F.2d 101 (5th Cir. 1973). This was error, and the exhibits should not have been admitted. In the circumstances, however, we have concluded that the error was not prejudicial. The records came in by way of footnote to the admissible testimony of Dr. Baldwin, and were cumulative of his testimony and that of others about the rigorous testing of Planavin by Shell and its established effectiveness. Certainly, it can in no

sense be said that the records were crucial evidence, or that without them the verdict would not be amply supported by other, proper evidence. The case should not be reversed on this ground. Fed.R. Civ.P. 61; 28 U.S.C. § 2111; see 11 C. Wright & A. Miller, Federal Practice & Procedure § 2885 (1973).

 Finally, Yellow Bayou complains of the receipt in evidence of photographs of some of its soybean fields in the 1972 crop year, showing Johnson grass infestation. In the state of the record, with evidence of Yellow Bayou's 1972 production already having come in and testimony having been given by its manager that a competing herbicide was used in that year—wholly applied, we note, by aircraft—we cannot say the admission of this evidence was erroneous.

This was the very type of a case for the jury. The trial was free of prejudicial error and fair to both sides; the jury has spoken. There it ends.

Affirmed.

5. Nicklaus v. Hughes Tool Co., 417 F.2d 983 (8th Cir. 1969).