Alfred F. PIRRONE, d/b/a Pirrone Wine
Cellars, Plaintiff-Appellee,

v.

MONARCH WINE COMPANY OF
GEORGIA, Defendant-Appellant.

No. 73–2913.

United States Court of Appeals,
Fifth Circuit.

July 10, 1974.

J. R. Cullens, William E. Cetti, John V. Burch, Cartersville, Ga., for defendant-appellant.

Alford Wall, Steven J. Martin, Atlanta, Ga., for plaintiff-appellee.

Before COLEMAN, CLARK and GEE, Circuit Judges.

GEE, Circuit Judge:

This diversity contract action was brought by Alfred F. Pirrone (Pirrone), a California wine-maker of modest capacity, against Monarch Wine Company of Georgia (Monarch), the nation's largest purchaser of peach brandy. From a jury verdict for Pirrone, Monarch appeals. We affirm in part and in part reverse.

Peach brandy is an off-season crop for California wine-makers such as Pirrone. Since peach production there occurs from late June into August, it is possible to produce this brandy and clear production facilities of it in time for the major activity, grape-crushing, which commences in late summer or early fall. In January of 1968, Pirrone executed a written contract with Monarch to produce and sell to it 150,000 proof gallons of the brandy for each of the 1968 and 1969 crop seasons at $.75 per proof gallon. Monarch was to have the option to buy 30,000 additional proof gallons each year should Pirrone produce so much, and Pirrone was to produce peach brandy for no one else during these years. A shipping schedule was provided by which about half the brandy was to be shipped during the period of production and the remainder in five equal monthly carloads thereafter.

For reasons not entirely clear, Monarch had no more than executed the Pirrone contract when it began to repent of it. Monarch witnesses at trial related that it had over-bought on brandy, and during 1968 the market price dropped to two-thirds of the contract price. By early June, Monarch executives were seeking to persuade Pirrone to modify the contract, then entirely executory, to diminish its amounts. Pirrone refused, but a memorandum in Monarch's files indicated a belief by its officials that Pirrone had agreed they need not take delivery of any of the 1968 brandy until December. At trial, Pirrone denied making such an agreement.

Agreement or no, Monarch took full advantage of the fact that Pirrone could ship no brandy whatever without a permit from the United States for each shipment—a permit which Monarch had to initiate. The record is clear that Monarch grossly violated the shipping schedules of the agreement. As a result, by late September, Pirrone was threatening to destroy the brandy unless he

received some shipment authorizations. And in late October Pirrone wrote to Monarch complaining of financial difficulties and requesting a substantial advance payment to tide him over. Monarch, however, maintained its position that the contract had been modified to require it take no shipments until December, though it did authorize one 16,000 gallon carload in late September as a "favor" to Pirrone. Just before Christmas, 1968, Monarch at last proposed to take 40,000 gallons in February, and Pirrone responded insisting on monthly shipments each of 15,000 gallons commencing in December.

With his facilities thus stuffed with Monarch's brandy and no sure relief in sight, Pirrone suggested in early January 1969 that the contract be ended. By his proposal, Monarch would take all the brandy which he had produced for it on a shipping schedule which would clear his storage by July. To complicate matters, Pirrone had produced a 30,000 gallon surplus because of the unusual sweetness of the 1968 peach crop, and Pirrone thus sought to have Monarch take this off his hands. His proposal was embodied in a writing, styled "Termination Agreement" and signed by him.

Monarch's response was to return to Pirrone a revised agreement, executed by its president and likewise dated in January 1969, under which Pirrone's storage would not be cleared until August and Monarch would not purchase the surplus. Pirrone rejoined with a telegraphic ultimatum to sign the agreement prepared by him and forward a shipping permit or stand suit on the original contract. The following day, February 5, however, he took a different tack.

Under that date, he wrote to Monarch's president, in pertinent part as follows:

Dear Mr. Gilsten:

This is intended as an addition and clarification to our termination agreement dated January 1969.

Monarch Wine Company of Georgia, Inc., will be required to take delivery of one hundred and thirty five thousand (135,000) proof gallons of peach high proof, excluding approximately fifteen thousand (15,000) proof gallons which Monarch has already received, on or before the 1st day of July, 1969.

The remainder of the letter consisted of bland references to housekeeping details. Pirrone's letter crossed in the mails one from Monarch's Georgia counsel to Pirrone stating flatly that Monarch would purchase none of the surplus brandy and urging execution of Monarch's form of the termination agreement. During the spring and summer of 1969 the remainder of the 1968 brandy was finally ordered out and delivered to the accompaniment of threats and rumblings by Pirrone and remonstrances by Monarch, none of which produced any definitive resolution of what the parties by now rather plainly saw as the sole remaining live issue between them, the disposition of the surplus 30,000 gallons from the 1968 crop year.

At last, when only 8,000 gallons remained to be delivered, California counsel for Pirrone made letter demand on Monarch to take the surplus forthwith, noting "that Mr. Pirrone sent you a Termination Agreement in January of this year in which you agreed to remove all of this brandy. . . ." This arrived on the same day that Monarch forwarded to Pirrone the permit for shipment of the last 8,000 gallons covered by letter remarking: "This completes the total amount under our agreement." Pirrone made no brandy for Monarch during the 1969 peach season, but in November filed a suit for lost profits on the 1969 portion of the original agreement in the California courts which was eventually dismissed, apparently for want of jurisdiction over Monarch's person. About two years after the abortive filing in California, Pirrone brought this action on the original contract seeking in three counts, damages for (1) delays in taking delivery of the 1968 crop brandy, (2) loss of profits on the 1969 crop increment, and (3) failure of Monarch to take the 30,000 gallon surplus produced in 1968.

Trial produced only a little light beyond the above, which is drawn chiefly from the parties' correspondence and memoranda introduced as exhibits. Both were ready writers. Two matters of some significance were, however, elicited in testimony. Pironne admitted, in ef-

fect, that by the letter of February 5, 1969, quoted in part above, he meant to mislead Monarch into believing he agreed to Monarch's conditions of terminating the contract, while maintaining a secret intent to force the 30,000 gallon surplus upon Monarch. He excused this by citing his desperation at having facilities clogged with brandy which he could not ship without Monarch's by-your-leave, his financial problems, etc. A Monarch official, for its part, admitted under heavy cross-examination that had Pirrone not agreed to Monarch's conditions, the remainder of the 1968 brandy would never have been ordered out at all. Pirrone's basic theories were no executed termination agreement or, if one, duress invalidating it, and breach and anticipatory breach of contract. On a general charge incorporating these theories, as well as waiver and the effect of partial agreements under Georgia law, the jury found for Pirrone in damages on each of his three counts.

■ On appeal, Monarch asserts that the verdict was inconsistent with itself as allowing recovery both on the original contract and on the termination agreement (viewed as an accord and satisfaction), want of evidence to support the verdict, and want of evidence to support the theory of duress plus an evidentiary point.[1]

■ The record evidence supports the Count 1 jury finding of damages caused Pirrone by Monarch's dilatory behavior in ordering out the brandy during 1968, forcing him to lose that grape-crushing season. It likewise supports the damages found under Count 3; a careful reading of the original contract shows it did not require brandy for the 1969 crop-year gallonage to be *produced* from that year's crop. Pirrone was therefore acting on rights at least implicitly giving him by the contract in producing, though unintentionally, the 30,000 gallon surplus in 1968. Under

the contract, he need not have feared a modest surplus in that year, since he had a right to carry it forward to apply on the 1969 gallonage. This he produced at a time when the contract was in full and unquestioned force and effect, and to this extent the 1969 portion of the contract became no longer executory on his side. His rights being to this extent fixed, they could not be ousted on any theory presented here except agreement on his part to relinquish them. There is sufficient evidence to support the presumed finding of the jury, confirmed by the court's judgment, that no agreement of his extended so far. There is no inconsistency in the jury awards under Counts 1 and 3. Both rest on Monarch's unilateral breach of the original contract.

■ As to Pirrone's recovery under Count 2, however, for lost profit on the executory portion of the 1969 gallonage, the case is otherwise. Without dispute, this portion of the contract was bilaterally executory at the time of the party's exchange of "termination agreement" drafts in January 1969. Both drafts contained provisions wiping out the 1969 gallonage and, to the extent that this portion of the contract was executory, we think the mutual intent of the parties to abandon it conclusively demonstrated by the record. Both, but especially Pirrone, repeatedly referred to their "termination agreement" after the January exchange and Pirrone's artfully-intended letter of February 5; and though the fate of the 30,000 gallon surplus remained ambiguous and disputed, each party plainly thought, objectively manifested, and intended the other to think that they had agreed on something. Otherwise at variance, their proposals for modifying the contract[2] met on this head. Both acted upon the agreement: Monarch received all of the 1968 brandy except the disputed surplus; Pirrone never after January 1969 so much as suggested the 1969 portion

---

1. That a copy of a document relevant to damages was admitted in violation of the best evidence rule, the original having been shown to be in existence. This was not reversible error. The figure for which the document was admitted had already been testified to without objection and the evidence was thus

cumulative. Yellow Bayou Plantation, Inc. v. Shell Chemical, Inc., 491 F.2d 1239 (5th Cir. 1974).

2. Which, under Georgia Law, required no new consideration. Ga.Code Ann. § 109A–2–209.

of the contract was in effect,[3] and neither offered to nor did make any brandy for Monarch from the 1969 peach crop. We are persuaded the record conclusively demonstrates that, under general principles of commercial law[4] and the pertinent sections of the Uniform Commercial Code as adopted by Georgia,[5] the parties reached and consummated an agreement terminating and settling between them all rights, claims and questions arising out of the executory portion of the 1969 segment of the agreement.

██ Insofar as the record supports any claim of anticipatory breach, we think it comprehended within and settled by this agreement. As for Pirrone's suggestion that duress motivated his assent to this agreement, the claim is far on the outer fringes of the doctrine. We have been shown no Georgia case[6] which supports the proposition that hardship resulting from mere commercial breach of contract terms brings that doctrine into play, and the havoc which such a holding would work with desirable settlements of disputed claims is obvious. Several Georgia cases do suggest that even where duress exists, one such as Pirrone who continues to accept benefits under an agreement tainted with it after the duress is removed may not later raise it.[7]

It follows that there was no evidence meeting Boeing v. Shipman[8] standards supporting the jury verdict under Count 2.

In summary we affirm the court's judgment based on the jury's findings on Counts 1 and 3 and we reverse the judgment insofar as it is based on the jury's finding on Count 2.

Affirmed in part, reversed in part.

3. Until filing his California action in November, a clear afterthought as to this claim.

4. Preserved where not specifically displaced. Ga.Code Ann. § 109A–1–103.

5. Ga.Code Ann. §§ 109A–2–207 to 109A–2–209.

6. And the party's briefs agree there is none in point.

7. *E. g.*, Williams v. Rentz Banking Co., 114 Ga.App. 778, 152 S.E.2d 825 (1966).

8. 411 F.2d 365 (5th Cir. 1969).