Mary Ann SODEN, individually and as independent executrix of the estate of Willard C. Soden, deceased, and as next friend of Willard Ray Soden, a minor, and Diana Lee Soden, Plaintiffs-Appellees,

v.

**FREIGHTLINER CORPORATION,**
Defendant-Appellant.

No. 82–1178.

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1983.

Rehearing Denied Oct. 11, 1983.

Thomas H. Crofts, Jr. and Ann Livingston, San Antonio, Tex., for defendant-appellant.

Sylvia Demarest, Dallas, Tex., for plaintiffs-appellees.

Before TUTTLE\*, POLITZ and GAR-WOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The defendant-appellant, Freightliner Corporation, appeals from a judgment on a jury verdict in favor of the plaintiffs-appellees, the Sodens, in this Texas law diversity action based on products liability. The plaintiffs-appellees are the widow and two children of Willard C. Soden, who was killed in a post-collision fuel fire while driving a truck designed and manufactured by Freightliner. The Sodens claimed that the design of the Freightliner fuel system was unreasonably dangerous and was the producing cause of the post-collision fuel fire which killed Willard C. Soden. On appeal, Freightliner argues that the district court committed reversible error with respect to three evidentiary rulings made during the trial, which (1) excluded statistical and opinion evidence offered by its expert, Mr. Hutton, (2) admitted with a limiting instruction evidence of other lawsuits against Freightliner involving accidents allegedly caused by defects in its fuel system, and (3) admitted opinion testimony by Robert Lasere, a lay witness, respecting the dangerousness of the step brackets mounted on the fuel tank of Soden's truck. Finding no reversible error, we affirm the judgment below.

## I.

### CONTEXT FACTS

On April 18, 1978, Willard C. Soden was driving a tractor trailer carrying a load of crude oil. The tractor was designed and manufactured by the defendant-appellant Freightliner. The trailer was made by another manufacturer. Soden's vehicle collided with a Ford Mustang at an intersection and rolled over onto its right side. Soden was not at fault in the accident. He immediately climbed up through the left door onto the outside of his vehicle's cab, but

while jumping from it he became engulfed in fire. He died the following day from burns he received in that fire.

The plaintiffs, Soden's widow and minor children, alleged that the defective design of the fuel system in the Freightliner truck was a producing cause of the fire which resulted in Soden's death. The thrust of their argument was that the cylindrical fuel tanks, mounted on the sides of the truck under the cab doors, were improperly protected and subject to breaking up and causing a fire in the event of a collision. In particular, they also argued that the brackets securing the steps to these fuel tanks had pointed ends which, in the event of a rollover, could puncture the fuel tanks. The resulting hole or holes could release diesel fuel near engine components hot enough to ignite the fuel, causing a fire in the engine-cab area. They sought $1,400,000 in compensatory damages and $10,000,000 in exemplary damages allegedly due because of Freightliner's "gross negligence" in failing to correct the design of the fuel system after having notice of its defects.

Freightliner took the position that the fuel tanks were located in the only position feasible for trucks of such design and that the step bracket did not, or could not have, punctured the fuel tank. It contended that the initial source of the fire was the crude oil from the trailer Soden was pulling. It also maintained that it had not been grossly negligent.

The jury held in the appellees' favor and awarded them a total of $885,300 in compensatory damages, but nothing in exemplary damages. Freightliner argues on appeal that the trial judge committed prejudicial error in the three evidentiary rulings discussed below.

## II.

### CLAIMS ON APPEAL

**A. EXCLUSION OF FREIGHTLINER'S STATISTICAL AND OPINION EVIDENCE.**

Freightliner, on direct examination, tried to elicit from Mr. Hutton, their expert and

---

\* Circuit Judge of the Eleventh Circuit, sitting by designation.

representative at trial, certain statistics on accidents involving fires in Freightliner trucks to rebut statistics offered by the Sodens on the frequency of fuel system fires in large trucks. These statistics and Hutton's calculations based upon them were also summarized on two charts which Freightliner attempted to introduce into evidence: one chart broke down the number of accidents involving fires into subcategories of (1) electrical system fires, (2) fuel system fires, (3) other classifications of fire, and (4) post-crash fuel system fires; and a second chart depicted Hutton's calculation that post-crash fuel system fires occurred only once every 409,785,800 truck-driving miles. Hutton was presumably prepared also to offer his opinion on the significance of these statistics.

Hutton asserted that the statistics themselves were based on data collected over a three-year period by a sister company, Consolidated Freightways, from its fleet of roughly 2,200 Freightliner trucks and purported to show that only three out of 3,014, or one-tenth of one percent of the accidents which occurred, were accompanied by a post-crash fuel system fire. Hutton's source for this information was Ms. Vorman, the assistant to the director of safety at Consolidated Freightways, who, according to what Vorman told Hutton, had compiled it from 3,000 accident reports made over the three-year period to the Bureau of Motor Carriers Safety on the Bureau's forms. Vorman, who did not testify, provided Hutton this information in a two-page letter (which was shown to the district court but not introduced into evidence) and in a telephone conversation.

Freightliner's counsel attempted to introduce the statistics and the two charts into evidence through Hutton in the course of the following examination:

"Q And have you had occasion to look in to and research the [occurrence] of accidents with these trucks?

"A I have attempted to do that from every available source that you can think of. And for the most part, there is much slack in available data.

"Between moving vans and cars, and it is really hard to say, you know, heavy duty combination vehicles such as the one Mr. Soden was driving, it is hard to find good data on that.

"Q And from the findings that you have made, do you find that the fuel system usually is or is not involved in the various wrecks that these trucks get involved in?

"A I think we have heard or seen all kinds of numbers batted around back and forth here. And the study I have the most confidence in, I have found it is about one-tenth of one percent of the accidents of the Freightliner trucks are apt to result in a post-crash fire that injures the fuel system.

"Q And have you accumulated some statistics on that particular point?

"A Yes, I have.

"Q And has a chart been prepared under your supervision?

"A Yes.

"Q Based on those statistics—" [1]

At this point the Sodens' counsel interposed an objection based on a motion in limine to exclude Freightliner's two charts.[2]

The district court, after extensive discussion with counsel and the *voir dire* of Hutton by both counsel, granted the motion to exclude the evidence. The district court's central concern was that Freightliner had not offered an adequate predicate for the statistics to which Hutton was testifying, which he had summarized on the charts, and on which he was attempting to base an opinion:

---

1. We assume that this question, which was interrupted by the objection of the Sodens' counsel, intended to elicit Hutton's opinion based upon the statistics he had just mentioned.

2. The Sodens' brief in support of this motion argued that these charts were inadmissible (1) because they were prejudicial under Fed.R. Evid. 403, (2) because they were summaries which did not comply with Rule 1006, and (3) because they were hearsay under Rule 801.

"And I am going to grant the plaintiff's motion in limine because it appears to me that there has been a failure to [comply] with a rule as well as an attempt to give a summary of testimony of a witness who has purported to have made the examination.

"But none of the supporting data nor is this examining data witness . . . available to the Court. This witness Gene [*sic*] Vorman is not available.

"Now, this is without prejudice to the defendant bringing in the witness Gene [*sic*] Vorman. And this data and affording plaintiff's counsel an opportunity to review the supporting data and a chance to be heard in the absence of the jury if it is to be requested."

In the discussion that followed, Freightliner's counsel asked the court, "You are excluding the charts? Are you excluding the evidence concerning it?" And the court responded, "I am [excluding the evidence] concerning everything until you come in with a better predicate and then I may after I have heard that, I may give it under a limiting instruction even then." The district court then instructed the jury to disregard the statistical evidence given by Hutton *immediately prior to the objection*.

The parties dispute whether the district court's ruling excluded Hutton's *opinion* based upon the statistics, as well as the figures themselves and the charts on which they were depicted.[3] We assume, however, from the court's response to the question by Freightliner's counsel that Hutton's opinion was also held inadmissible to the extent that it was dependent on the statistics. Even so, the district court's exclusion of this

evidence was within its discretion. We examine first the excluded opinion testimony.

 Rule 703 of the Federal Rules of Evidence states that:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

This Rule broadened considerably the permissible basis for expert opinions, which had been limited at common law to

"(1) information obtained by the expert's personal knowledge; (2) the hypothetical question, which assumes facts reasonably supported by the evidence; and (3) in some jurisdictions, testimony previously elicited during the trial, with the expert instructed to assume the truth of that evidence and to base his conclusions thereon." *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1313, 1322 (E.D.Pa.1980).

The Rule was intended, as described in the Notes of the Advisory Committee on Proposed Rules, to "bring the judicial practice into line with the practice of the experts themselves when not in court." Thus, under Rule 703 an expert can discuss as the basis for an opinion facts or data which are otherwise inadmissible hearsay, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[4] A trial

---

**3.** The Sodens argue on appeal that they did not object to, nor did the district court exclude, Hutton's *opinion* based upon these statistics. They argue that the court merely excluded his presentation of statistics in what amounted to a nonexpert capacity. *See United States v. Brown,* 548 F.2d 1194, 1206 n. 22 (5th Cir. 1977).

**4.** Rule 703 has been used in a variety of contexts to allow the admission of expert opinion based on sources which are not themselves admissible or offered into evidence. It has been used, for example, to allow expert opin-

ions based on reports of government agencies, *see, e.g., Nanda v. Ford Motor Co.,* 509 F.2d 213, 222 (7th Cir.1974) (citing proposed Rule 703); safety codes published by safety organizations, *see, e.g., Frazier v. Continental Oil Co.,* 568 F.2d 378, 383 (5th Cir.1978); and on audits and financial reports, *see, e.g., United States v. Genser,* 582 F.2d 292, 298–99 (3d Cir.1978), *cert. denied,* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979); *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir.1980). And *see generally* 49 A.L.R.Fed. 363 (1980).

Many of the cases involving reliance on the opinions or statements of third parties concern

court's inquiry into whether this standard is satisfied must be made on a case-by-case basis and should focus on the reliability of the opinion and its foundation rather than merely on the fact that it was based, technically speaking, upon hearsay. *See Bauman v. Centex Corporation, supra,* 611 F.2d at 1120 n. 5. A district court's determination in this regard will be reversed only if it constitutes an abuse of discretion. *Id.* at 1120; *accord, Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 844 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981).

■ Assessing Hutton's statistics, as presented to the court below, we conclude that they were not shown to be of a type reasonably relied upon by experts in his field, and thus the district court did not abuse its discretion in excluding any opinion dependent on them. First, the statistics on which Hutton relied were prepared strictly in anticipation of litigation and were based on information received from a sister company. They were not part of a published study and were not even made available to

the appellees until Freightliner attempted to introduce them.[5] These facts standing alone do not suffice to impugn the reliability of the statistics, but do properly signal a trial judge to make a critical review of their bases.

Second, the only memorialization of what Hutton was relying on, namely, Vorman's summary of her analysis of certain Consolidated Freightways records made at Hutton's request for this case, was *extremely* informal—a two-page letter to Hutton, not introduced into evidence, and a follow-up telephone conversation with Hutton.[6] The telephone conversation occurred because of a misunderstanding with respect to Hutton's original request. No record of this conversation existed except as a notation by Hutton on the original letter. Third, as Hutton seemed to acknowledge, a review of each of the 3,000 reports was a major task, yet nowhere did he explain the method by which Vorman accomplished it: whether the summary of the data from these reports was made on a regular basis (which it ap-

medical testimony, and the Advisory Committee Notes following the Rule particularly provide for expert opinions with this basis. Reliance on third parties for expert opinions has been allowed to some degree in other contexts as well. For example, in *Bauman v. Centex Corp., supra,* this Court upheld under Rule 703 the admissibility of the opinion of an accountant, qualified as an expert, which was based primarily upon his review of certain companies' files and financial statements and in part upon library research on the companies and on " 'the stock analyst people that are analyzing companies for a living.' " 611 F.2d at 1120. The Court stated that "[t]he record indicates that these sources, while not all in evidence, are of the type reasonably relied upon by certified public accountants in evaluating the operation of corporations and did not render the testimony unreliable." *Id.* (footnote omitted).

In *United States v. Genser, supra,* the defendant-appellants in a tax evasion case objected to the testimony of a special agent "as an expert witness about his opinions concerning the results of an IRS audit of the appellants' records, since [the agent] did not participate in or supervise the audit and the audit itself was not introduced into evidence." *Id.* at 298. The Court found that the agent had in fact made a firsthand investigation, but the record was unclear as to whether he had relied in part upon the audit conducted by others. The Court con-

cluded that, even so, his opinion would have been admissible, stating that the trial judge did not abuse his discretion "in allowing [the agent] to rely in part—if he did—upon the government audit in reaching his conclusions, especially since the appellants attack the reliability of the audit papers primarily on the ground that IRS agents acted improperly in issuing administrative summonses." *Id.* at 298–99 (footnote omitted).

In both *Bauman* and *Genser,* the reliance on third parties was limited and shown to be reasonable. As discussed below, however, Hutton relied on statistics of questionable validity, given him by a third party, on whom he relied solely. The facts of this case thus distinguish it from both *Bauman* and *Genser.*

5. At oral argument Freightliner's counsel admitted that the Sodens were not furnished with the Vorman letter until this time, in spite of repeated requests by the Sodens during pretrial discovery.

6. Hutton was not himself relying on the Bureau of Motor Carriers Safety reports which were available to the public and, as business or official records, had a meaningful degree of reliability, but rather on Vorman's summary of what she claimed to have found after her *ad hoc* and litigation-oriented analysis of those records.

parently was not); whether Vorman herself read and analyzed each of the 3,000 reports or supervised employees in that task; and whether and in what form the Bureau of Motor Carriers Safety accident reports required information about post-crash fuel system fires.

Finally, in addition to these factors which suggested weaknesses in the reliability of Hutton's statistics, the Sodens raised a more fundamental question which placed serious doubt upon their relevance. Hutton's two-page letter from Vorman stated that "[d]uring the period of '75 through '78, we found fifteen road acci-

dents which were *caused* by some type of fuel fire.'" (Emphasis added.) The appellees argued that this information failed to include accidents *not caused by fire, but in which post-crash fires resulted.* Hutton responded that he got this information in the follow-up telephone conversation.[7]

The appellees, however, offered the annual summary of these Bureau of Motor Carriers Safety reports for 1977, which apparently included information only on the *causes* of accidents, as proof that these reports did not include information with respect to post-crash fuel system fires.[8] This possibili-

---

**7.** The Sodens' counsel questioned Hutton on this point during the *voir dire:*

"Q And [the letter] says it contains information concerning road accidents which were caused by some type of fire?

"A That is what it says.

"Q It doesn't say that it contains any information on accidents that resulted from something else other than fire in which a post-crash fire resulted, and there is no place in this letter that gives you that information.

"A The follow-up phone conversation gave you that information.

"Q But the letter which forms the basis of your chart does not state that it includes accidents which were caused by some other reason but which resulted in a post-crash fire?

"A It doesn't. That is why I had to make the follow-up phone conversation in order to obtain that information to make a meaningful analysis of the data.

"Q Where is there anything in writing concerning the follow-up conversation that you had, sir?

"A There is nothing in writing regarding the phone conversation other than the data I myself wrote in beside the chart on the same letter."

Hutton also testified under direct examination during the *voir dire* that, "I got the letter and in attempting to analyze it further, I called up the same lady that is referenced in there and talk[ed] to her and said, 'Can you supply me the mileage that the vehicles were operated over this time period or the number of accidents?' And she supplied me that data over the telephone."

**8.** The following excerpt from the *voir dire* of Hutton by the Sodens' counsel reveals how this concern was raised:

"Q Let me hand you Plaintiff's Exhibit 49, sir. (Indicating) 1977 accidents of motor carriers of property. That is the reports you are

talking about that they submitted to the Bureau of Motor Carriers Safety; isn't that correct?

"A This is an analysis by the Bureau of Motor Carrier Safety based on information supplied to them.

"Q And that information only classifies and documents incidents of fires which caused the accident itself, sir, there is nothing in that report nor is there anything in any of the other Bureau of Motor Carriers Safety reports that says anything about accidents which were caused by one thing but yet resulted in a post-crash fires, and that was the basis of the letter and the information that you're trying to get in to this case; isn't that correct?

"A I really don't understand what you're trying to say.

". . . .

"Q This report classifies as stated on Page Five, collision accidents and non-collision accidents and the cause of those accidents. They do not attempt to analyze in any way, sir, anything that occurs after the accident takes place.

"I can submit all of these reports to you for your study. I can submit them to the Court for [its] study. This is not a study of what occurs after the accident, is it Mr. Hutton?

"A That isn't; no.

"Q And the letter that you got from Consolidated Freightways was based upon the reports that they submitted that go in to this publication; isn't that correct?

"A Yes, it is.

". . . .

"A . . . This particular data didn't go in to the detail about the post-crash fire. They just listed fires and what this whole case is about is a post-crash fuel fire; and so, I wanted to obtain data that relates to all kinds of fires and take that and analyze it myself and say these are post-crash fires. It is my analysis that says post-crash fires.

ty cast doubt on how Vorman could have derived the necessary information, and Hutton was without question relying on her alone for the statistics which formed the basis of his opinion.

This doubt involved not merely the weight Hutton's statistics and opinion should have been accorded, but whether they had any meaningful relevance at all to the frequency of post-crash fuel fires in Consolidated Freightways' fleet of Freightliner trucks. Were the Sodens, in fact, correct in their assessment of Vorman's summary, Hutton's opinion based upon it would have been misleading and largely irrelevant. Though courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of those sources. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co., supra,* at 1323–24; 3 J. Weinstein & M. Burger, *Weinstein's Evidence,* ¶ 703[03] at

703–16 (1982); 3 D. Louisell & B. Mueller, *Federal Evidence,* § 389 at 661–62 (1979). Thus, the district court quite properly used its discretion to exclude Hutton's opinion until a better predicate for his statistics could be presented.[9]

Even with this opportunity, however, Freightliner made no further attempt to satisfy the district court's concerns, even though the presentation of evidence did not conclude until four days later and Hutton testified again on the last day. Nor did Freightliner request a continuance or indicate to the court that any practical difficulty stood in the way of its establishing a better predicate, either because Vorman was unavailable to testify or because the records could not be reproduced. Given the concerns which were brought to the district court's attention and which went to the relevance and reliability of Hutton's statistics, exclusion of his opinion testimony

"MS. DEMAREST: Q Sir, the reports that this lady [Vorman] looked at were submitted to the Bureau of Motor Carriers Safety, and those reports analyzed the cause, listed accidents by cause; isn't that correct?

"THE WITNESS: A That is true, and she has put a summary on these, of these five accidents that related to fuel fires that enabled me to determine if they were post-crash or pre-crash fires.

"Q And she says in her letter that she is giving you information concerning accidents which were caused by some type of fire?

"A That is how she states it.

"Q You do not have any idea because you did not look at every report that she submitted to the Bureau of Motor Carriers Safety, did you?

"A Of course I didn't.

"Q You do not [know] whether there were accidents that were submitted to the Bureau of Motor Carriers Safety that were not caused by fire but later resulted in a fire, and you cannot tell the Court that?

"A I believe I can on the basis of what [she] has submitted here. She has put a brief summary. Some of these were post-crash and some were pre-crash.

"Q But she is saying in her letter that she is only giving you information concerning accidents which were caused by fire?

"A I think that is the terminology she has used in that particular thing and it wasn't my intent and the phone conversation, I am sure, the way [she] responded, that she supplied that data related to any accident in which a

fuel fire was in any way caused or post-crash, and was in any way involved.

"Q Does she say that anywhere in this letter?

"A It is your interpretation of it that she doesn't. It is my interpretation of the letter and phone call that it contains that information.

"Q And you did not look at the report that was submitted to the Bureau of Motor Vehicle Carriers Safety to determine whether or not there was an accident which was not caused by fire which later resulted in a post-crash fire?

"A I didn't examine these three thousand cases because I think the letter speaks for itself, and that is what I am trying to say.

"Q In each one of these instances that she mentioned to you the damage to the fuel system was in some way related to the initial collision itself?

"A Definitely not.

"Q That is correct. It hit a drainage culvert and the fire, it appears from this is subject to the interpretation came about immediately and could have caused the driver to go off the road and have the accident, and that is the only reason that it should have been reported to the Bureau of Motor Carrier Safety?

"A No, it isn't."

9. The district court made this point clear to Freightliner at three different times during the discussion of the admissibility of Hutton's evidence.

based upon them clearly was not an abuse of discretion.

■ Likewise, the district court's exclusion of the two charts Hutton had prepared and its instruction to the jury to disregard Hutton's mention of the statistics before the objection were also proper. Hutton's testimony respecting the statistics was inadmissible as direct evidence of the frequency of post-crash fuel fires in Freightliner trucks because it was hearsay, being based on a letter and a telephone conversation. *See United States v. Brown,* 548 F.2d 1194, 1206 n. 22 (5th Cir.1977); *cf. United States v. 478.34 Acres of Land,* 578 F.2d 156, 159 (6th Cir.1978). The charts were also correctly excluded because, as summaries of Hutton's statistics and calculations thereon, they could not be admitted unless the underlying information was also admissible. *Gordon v. United States,* 438 F.2d 858, 876–77 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); *United States v. Kim,* 595 F.2d 755, 764 (D.C.Cir.1979). *See also United States v. Foshee,* 606 F.2d 111, 113 (5th Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1036, 62 L.Ed.2d 766 (1980).[10]

Freightliner argues in opposition to the exclusion of the opinion evidence that courts have recognized that experts often rely on third parties for facts and data in expressing opinions under Rule 703. It argues that the doubts raised as to the reliability and relevance of Hutton's statistics were mistaken and that in any event cross-examination, not exclusion, was the proper means of handling any weaknesses in Hutton's opinion. We reject these arguments.

Experts may under certain circumstances rely on the information received from third parties, but in this case reliance on the third party was not the only significant source of concern.[11] The most troubling aspect of the evidence lay in whether the reports submitted to the Bureau of Motor Carriers Safety actually contained regularly reported information about post-crash fuel fires. Freightliner argues that the doubts raised in this regard were mistaken. It asserts on appeal that the "Bureau of Motor Carriers Safety define[s] a 'reportable accident' as one resulting in a fatality, injury, or certain property damage." Since post-crash fires result in property damage, they are also included in the accident reports.

■ This argument, although it may be valid, was not made to the district court, which had before it the Vorman letter which stated that it was listing only accidents which were *caused* by fire. Nor did Freightliner explain the particulars of how Vorman assembled the information given to Hutton, which might have described the feature of the accident reports which made the number of post-crash fires available from them. The court did have before it an indication that post-crash fuel fires were not included in the Bureau reports, which was never squarely rebutted by Freightliner. Given the evidence concerning the statistics which was presented, the district court properly exercised its discretion in requiring that Freightliner offer a better predicate for the statistics before it would admit Hutton's opinion dependent upon them. Vorman was not available for cross-examination. Hutton could not be cross-examined on the Bureau of Motor Carriers reports because they were not available and he had not examined them. Moreover, as noted, the concerns respecting these statistics extended to their relevance, not simply their weight. Accordingly, we also reject Freightliner's argument that cross-examination was available to bring out any weak-

10. Freightliner's argument for the admissibility of the charts is tied to its contention that Hutton should have been allowed to testify about the statistics as the basis for his opinion. Since the charts would merely have been a summarization of those statistics, already in evidence as the basis of his opinion, they were also properly admissible. This argument, of course, fails because we have concluded that Hutton's testimony regarding the statistics is not admissible. We decline to consider the issue of the use of charts to summarize, under Rule 1006, the bases of expert opinions admissible only because of Rule 703.

11. Thus, Freightliner's citations to the effect that reliance on third parties may be appropriate are inapposite.

nesses in Hutton's testimony, and that his opinion, therefore, should not have been excluded.

## B. EVIDENCE OF OTHER LAWSUITS AGAINST FREIGHTLINER.

Over Freightliner's objection the district court admitted, with a limiting instruction, the appellees' evidence that five suits and at least three informal complaints had been filed against Freightliner, which included allegations of "injuries to users and bystanders of [Freightliner] trucks from post-collision diesel fuel fires." The following is the sum of that testimony, elicited from Hutton on cross-examination by the appellees' counsel:

"Q Now, sir, isn't it true that prior to the manufacture and sale of the truck that is involved in this case, your company had actual knowledge of injuries to users and bystanders of these trucks from post-collision diesel fuel fires, you actually knew that this was occurring?

"A We had some knowledge of that.

"Q And isn't it also true that your knowledge included the fact that your company had been sued in litigation where these allegations had been made?

"A I am aware of a number of litigation cases; yes.

"Q In fact, in at least five former litigation cases that preceded this one as well as some three to five informal complaints that had not yet come to litigation?

"A Somewhere in that neighborhood, I don't know the exact numbers."

At this point, the district court gave a limiting instruction, which stated that the existence of the allegations in the suits was no evidence of their truth, but was only evidence of Freightliner's *notice* of claims of defective design.[12]

Freightliner does not object to the first question and answer quoted above or to the mention of the informal complaints, but only to the mention of the lawsuits which had been filed.[13] It argues on appeal (1) "that the mere existence of the suits is not relevant to notice," and (2) that if it is, "its

---

**12.** The limiting instruction stated:

"Complaints involving other litigation that have been mentioned here are not being offered by the plaintiff to prove the truth of the matters asserted in such litigation but instead, are being offered *only to show that the defendant had prior notice of allegations or claims of defective design* of the fuel system related to the issues in this case.

"Those complaints and in those other lawsuits and in those informal complaints, I don't know just how the testimony described it or the question described it, but as I understand it, it was by letter or notice of some kind, but notice of *complaints are unsworn hearsay allegations of persons seeking to recover money damages* from the defendant.

"*The complaints are not proof of the matters alleged.* The fact that these people made complaints of these same matters or similar matters or related matters are not proof of the matters that they claim or allege *and should not be considered by you as such.*

"The complaint should *only be considered for the fact that they gave notice to the defendant that these plaintiffs were making these allegations* and seeking to recover money damages from the defendant.

"So, this knowledge, this proof of other complaints is *only* received within that limited area of showing notice of such complaints received by the defendant or notice to the defendant that the defendant has notice of such complaints.

"That is all it means. *It doesn't mean that there is proof of the matters complained about.* That is a matter that is yet to be determined in this lawsuit.

"And there is no fact—*The fact that these other complaints are made doesn't mean that you take those complaints, that there is merit to them* or substance to them [but] just [that] the defendant had notice of the complaints.

"*Each case has to be judged on its own merits.* And so, this proof is received by you only to show notice of such complaints. All right; that is the limiting instruction the Court has given in connection with the matter." (Emphasis added.)

**13.** Freightliner asserted at oral argument that the whole trial was contaminated by this and other references to lawsuits against Freightliner. An objection was made only to one of these other instances, however, and they were not numerous nor given any sort of emphasis during the trial. With respect to the one other objection, which has not been reurged on appeal, Freightliner's counsel himself characterized the particular reference involved as being of "no great consequence." On appeal, Freightliner objects only to the two referenced questions.

potential for unfair prejudice so outweighs its weak probative value that the admission of the evidence was an abuse of discretion."

■ We hold that the district court's decision to admit the evidence of the prior litigation was not reversible error. The Sodens offered this evidence to show that Freightliner had notice of the defective design of its fuel system, which was an element of their claim for exemplary damages. In a products liability case based on defective design, evidence of the defendant's knowledge of other accidents may be relevant to its notice or knowledge of the defect, if the accidents occurred under substantially similar circumstances. *Prashker v. Beech Aircraft Corporation,* 258 F.2d 602, 608 (3d Cir.) *cert. denied,* 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958); *Ramos v. Liberty Mutual Insurance Co.,* 615 F.2d 334, 338 (5th Cir.1980), *cert. denied sub nom. Rucker Co. v. Shell Oil Co.,* 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981). Such evidence is relevant because it makes more probable "a fact that is of consequence to the determination of the action"—in this case Freightliner's knowledge of the defective design of its fuel system, which was a required element in the appellees' claim for exemplary damages. *See Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981); *Maxey v. Freightliner Corp.,* 665 F.2d 1367 (5th Cir.1982).[14]

Some decisions have held evidence of prior litigation, introduced by means of a complaint, relevant on the question of notice if the complaint contains allegations of a design defect causing an accident under circumstances substantially similar to those in the case before the Court. *Gulf States Utilities Co. v. Ecodyne Corp.,* 635 F.2d 517, 519 (5th Cir.1981); *Julander v. Ford Motor Co.,* 488 F.2d 839, 846 (10th Cir.1973) (excluding the complaints as notice of defective design, however, because they were not *prior* to the plaintiff's accident). *See also Gardner v. Q.H.S., Inc.,* 448 F.2d 238, 244

(4th Cir.1971) ("letters of complaints [nonlitigation] should have been admitted where they described identical or similar experiences"; "specific letters may be withheld from the jury by the district judge, in the exercise of his discretion" on Rule 403 grounds); *New York Life Insurance Co. v. Seighman,* 140 F.2d 930, 932–33 (6th Cir. 1944).

Evidence of *allegations* of defective design arising out of other accidents is obviously less probative on the question of notice than evidence which shows the particular circumstances of the other accidents, how the design defect was involved in them, and how the company became aware of them. Allegations in a complaint may be unsubstantiated and because of their hearsay character they are not subject to cross-examination. Certainly there may be potential dangers in this area, and caution should be exercised when dealing with mere allegations, even to prove notice. Nonetheless, allegations alone may, depending on the circumstances, have some probative value as evidence of notice, and the trial judge generally has broad discretion in assessing their worth and possible prejudice.

■ Turning to the case at bar, the evidence of the other lawsuits involved allegations of post-crash fuel fires in Freightliner trucks caused by the defective design of the fuel system, which were the same allegations being made by the plaintiffs. Thus, the substantial similarity requirement was satisfied with respect to the allegations made in the suits. In addition, the weaknesses otherwise inherent in allegations as a basis for notice were mitigated by several factors. First, Freightliner did not contest, and it is apparent that the parties proceeded at trial on the assumption, that the underlying accidents actually occurred, and that they involved post-crash fuel fires. There is no suggestion Freightliner believed otherwise at any relevant time. Freightliner, and often Hutton himself, investigated

---

**14.** The record strongly indicates that the claim of exemplary damages was completely *bona fide* and serious, and was made for its ostensible purpose, as opposed to being merely a vehicle to get before the jury evidence which otherwise might have been ruled inadmissible, and nothing before us suggests the contrary.

these accidents on a regular basis. Second, the district court gave Freightliner the opportunity to rebut its conclusion that the allegations were "sufficiently similar" to the facts of the case before it because they involved attacks "on the defective design of the fuel system":

> "THE COURT: Mr. Hebdon, if they are not of the same type, do you want to go in to it to show they are not the same[?] I will hear you and I will entertain the motion to strike.
>
> "MR. HEBDON: I understand, sir.
>
> "THE COURT: The only way I can do it is [to proceed] with the whole interrogation. If you think that is necessary, I will do it."

Freightliner, however, made no attempt after this offer to analyze or show that the accidents involved in the suits were not similar.[15] Finally, it was arguably to Freightliner's advantage that facts of the specific accidents (the actual occurrences of which were not really disputed, as we have noted) not be brought out in detail to show the jury the degree of similarity of the other accidents by direct evidence. Thus, although the use of unsupported allegations in prior lawsuits to prove notice may not have been of the strongest probative value, neither was the lack of support particularly prejudicial.

In this regard we note that although Freightliner argues on appeal that this evidence was unduly prejudicial under Rule 403, it did not raise that issue at trial nor seek a ruling on it.[16] Thus, we question whether this objection has been properly preserved for our review. *See Falcon v. General Telephone Company of the Southwest*, 626 F.2d 369, 382 (5th Cir.1980), *vacated on other grounds*, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981). We conclude that the admission of the evidence did not substantially and unfairly prejudice Freightliner's rights to a fair trial. We note at the outset that we are at a distinct disadvantage in weighing probative value against the danger of unfair prejudice for the first time on appeal. The plaintiffs and the trial court were not given an opportunity to address this contention, or to attempt to mitigate the complained of effects, at trial. Moreover, in this case the questions complained of were followed by a most thorough and proper limiting instruction, which we have set out, emphasizing certain particularly apt portions, in note 12, *supra*. This instruction properly made clear the hearsay, unsworn, and self-serving nature of the other complaints, and specified exactly what consideration the allegations in the other lawsuits were and were not to be given, and mitigated the danger of any unfair prejudice. *See United States v. Moore*, 522 F.2d 1068, 1079 (9th Cir.1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976) ("the judge's careful limiting instructions undoubtedly minimized, if they did not eliminate, any unfair prejudice that might have accrued"); *United States v. Catalano*, 491 F.2d 268, 274 (2d Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974).

Further, the mention of the lawsuits to which Freightliner objects on appeal consisted of two questions asked over the course of a two-week trial which generated over 1,000 pages of transcript. Their existence was not unfairly emphasized at the trial. And, the allegations in the other suits were somewhat probative on the issue

---

15. Prior to this offer by the court Ms. Reser, also counsel for Freightliner, had argued that in one of the accidents the fire had not been caused by the fuel tank in the Freightliner but in the other vehicle involved.

16. Freightliner did make a reference to Rule 403 in a *pretrial* motion, and the judge mentioned the issue early in the trial, stating, "[I]f the Defendant under [*Ramos v. Liberty Mutual Insurance Co., supra*] can show of a specific prejudice with regard to a particular accident, of course, I will exclude that probably." This is inadequate to preserve that point for review, absent some kind of renewal of the motion or grounds thereof, as was invited. *See Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir.1980).

When the objections were made at trial, however, Freightliner raised only the issues of relevance, arguing that the accidents on which the suits were based were not shown to be sufficiently similar to Soden's accident, and hearsay, arguing that the mention of the suits was inadmissible on that ground.

of notice given the fact that the accidents on which they were based admittedly included post-crash fuel fires involving Freightliner trucks.

Freightliner argues that the plaintiffs did not *need* this evidence to prove that it had some knowledge of post-crash fuel fires because Freightliner had admitted this much. Thus, the value of the evidence was weakened for the purposes of balancing under Rule 403. *See* 22 Wright & Graham, *Federal Practice & Procedure* § 5214 at 268–69 (1978). However, evidence of specific allegations of fuel system defects is clearly more probative on the question of knowledge than Freightliner's admission that it had "some knowledge" of injuries from post-collision fuel fires generally.

On the degree of prejudice, Freightliner relies on *Yellow Bayou Plantation, Inc. v. Shell Chemical, Inc.,* 491 F.2d 1239 (5th Cir.1974), in which the plaintiff sued a herbicide maker for damages caused by the ineffectiveness of its products. On appeal the Court upheld the exclusion of "a list of lawsuits over, and complaints to Shell about, Planavin [the herbicide], offered to show that Shell knew or should have known that Planavin was ineffective." *Id.* at 1242–43. The Court concluded:

"The most that these items could have indicated was that absent third parties had made this claim to or against Shell from time to time. To exclude evidence of such faint probative value and high potential for unfair prejudice was well within the trial court's discretion." *Id.*

Here, as in *Yellow Bayou,* the discretion of the trial court, now reflected in Rule 403, points to affirmance of the trial court's ruling, not reversal. We do not suggest that the trial court lacked discretion under Rule 403 to exclude the evidence. Rather, we hold that its admission was not reversible error.

Finally, it is certainly important to note that Freightliner prevailed on the issue of exemplary damages. The only issue to which the complained of evidence was relevant, as tending to show Freightliner's knowledge, was resolved by the jury in Freightliner's favor. *See Ersler v. T.F. Schneider Corp.,* 188 F.2d 1022, 1023 (D.C. Cir.1951); *Trueworthy v. Gelman Construction Co.,* 455 F.2d 1377, 1379 (D.C.Cir.1971). The evidence was not offered, or argued to the jury, as showing anything other than notice, and the jury was properly instructed that it could be considered for no other purpose. And, the jury's rejection of exemplary damages also generally tends to indicate that it was not unduly inflamed with prejudice against Freightliner.

In the light of all these circumstances, we are unable to find reversible error in the matters complained of respecting the other lawsuits.

## C. LASERE'S OPINION ON THE FREIGHTLINER STEP DESIGN.

As its final point of error, Freightliner argues that the district court abused its discretion in admitting the opinion testimony of plaintiffs' witness, Robert Lasere, because he was neither an expert nor properly qualified to express an opinion as a lay person under Rule 701.

Lasere was employed by Sigmor Truck Service as its service manager in charge of the daily maintenance of about sixty trucks, mostly Freightliners, and in charge of the major repairs and preventive maintenance on about 500 trucks altogether. He had roughly eighteen years of experience working on large trucks. Sigmor handled the maintenance of the truck involved in Soden's accident, and Lasere was in charge of removing it from the scene.

Lasere testified, over Freightliner's objection, to his observation of the damage to the fuel tanks on Soden's truck and on two or three others he had seen following accidents. With respect to the other accidents (one rollover and one or two jackknifes of Freightliner trucks, none of which involved fires) he stated that when the wrecks were brought into the repair yard he had seen puncture holes in the fuel tanks at the location of the step brackets. He testified that he had seen similar holes in the fuel tanks of Soden's truck. He then gave his opinion that the step brackets were the

cause and that their design was dangerous. Finally, he described his decision, following Soden's accident, to modify the step bracket, which secured the steps to the fuel tank, by sawing off its pointed ends. On appeal, Freightliner objects only to what it considers to be Lasere's opinion testimony on the cause of the punctures and on the dangerousness of the step design.[17] We hold that the district court acted within its discretion in admitting this evidence.

While the Sodens did not offer Lasere as an expert under Rule 703, he indisputably had very considerable practical experience and specialized knowledge. Rule 701, concerning lay opinions, provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

■■■■ This Court has noted three elements which must be present for lay opinion evidence to be admissible under Rule 701. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250 (5th Cir.1980).

First, the witness must have "personal knowledge of the facts from which the ... opinion is said to derive." Second, a "rational connection" must exist between the opinion and the facts upon which it is based; or put another way, "the opinion ... must be one that a normal person would form from those perceptions." Finally, "the opinion ... must be helpful, either in understanding the testimony or in determining a fact in issue." *Id.* at 263. The fact that an opinion goes to an "ultimate fact" does not necessarily preclude its admissibility under Rule 701. If these requirements are satisfied, a layman can under certain circumstances express an opinion even on matters appropriate for expert testimony. *See Farner v. Paccar, Inc.,* 562 F.2d 518, 528–29 (8th Cir.1977); *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir.1979). *Cf. Scheib v. Williams-McWilliams Co., Inc.,* 628 F.2d 509, 511 (5th Cir.1980).[18]

■■ Application of the *Lubbock* criteria to this case reveals that the admission of Lasere's opinion testimony was not an abuse of discretion. First, contrary to Freightliner's assertions, Lasere had suffi-

---

17. The following excerpts include the passages Freightliner has characterized as Lasere's inadmissible opinion testimony:

"A The tank [on Soden's truck] was pushed in or cut on the right-hand side where the steps would have been mounted on it.

" . . . .

"A Well, if there was any kind of pressure against that step, it would push it into the tank.

" . . . .

"A No. The only reason we done it [the modification which consisted of sawing the pointed ends off of the step brackets] was I felt like it was a dangerous situation, and I done it mainly for the safety of the trucks or the drivers.

" . . . .

"A The decision was made when I looked at the trucks in the yard and seen what had happened; in other words, where the step had been pushed into the fuel tank and punctured it after seeing roughly three of these that happened at different times, we decided it was a dangerous situation especially with the exhaust coming right over the tanks. . . . "

18. Freightliner cites decisions from three other Circuits for the proposition that "where the issue [on which opinion testimony is offered] concerns a product's design, expert opinion is the only method of proof." This assertion misconstrues the holdings of these cases. In both *Bauman v. Volkswagenwerk Aktiengesellschaft,* 621 F.2d 230, 234 (6th Cir.1980), and *Huddell v. Levin,* 537 F.2d 726, 736 (3d Cir. 1976), the Courts noted in dictum that in cases where the part or design is not *patently defective,* expert opinion testimony is required. In neither case had any nonexpert opinion relative to a design defect been offered. In *Dashiell v. Keauhou-Kona Co.,* 487 F.2d 957, 962 (9th Cir. 1973), the Court held without discussion or citation that nonexpert opinion testimony by a golf cart user was inadmissible on the issue of the "braking" characteristics of various carts. Thus, we do not construe these cases to announce the hard-and-fast rule asserted by Freightliner. We do note that, taking into account Lasere's very substantial practical expertise, his observation of puncture holes at the location of the step brackets arguably revealed a patent defect, which would satisfy the rule stated in *Bauman* and *Huddell.*

cient personal knowledge of facts to form an opinion. Though he did not see any of the accidents firsthand, he soon after observed, in the normal course of performing his duties, holes or cuts in Freightliner fuel tanks near the location of the pointed step brackets, which was a sufficient basis for the opinion that the brackets were the cause of the holes. Second, Lasere's conclusion was rationally supported and would have been apparent to a "normal person" in his position. His additional conclusion that this situation was "dangerous" was also rational. No great leap of logic or expertise was necessary for one in Lasere's position to move from his observation of holes in Freightliner fuel tanks at the location of the step brackets, and presumably caused by them, to his opinion that the situation was dangerous. His testimony on this point did constitute an opinion which might have better been given by one more formally an expert; however, it had a strong basis both in his observation and in his experience. As Freightliner's counsel admitted at oral argument, Lasere was a "practical expert" in the field of trucks, if not an expert in their design. Lasere's testimony with respect to the dangerousness of the step brackets was also obvious, given the modification which he testified he made to them after all he had seen.

Finally, Lasere's conclusion that the step brackets were causing punctures in Freightliner fuel tanks was also helpful to the trier of fact in satisfaction of the third *Lubbock* criterion. It provided examples of one aspect of the design defect which the plaintiffs had alleged. During trial, the plaintiffs offered evidence that a diesel fire from the cab, not an oil fire from the trailer, had killed Soden, and that the weight of eighty pounds dropped on a step bracket from a height of one foot could puncture the fuel tank. Lasere's testimony was a helpful link because it showed that an accident could also cause a puncture.

Thus, although Lasere's opinion with respect to "dangerousness" may have been more properly made by one more formally

an expert, given the particular facts of this case, we conclude that no reversible error occurred in its admission.

AFFIRMED.